# WESTERN AIR LINES, INC. *v.* CRISWELL ET AL.

No. 83–1545.   Argued January 14, 1985—Decided June 17, 1985

402

STEVENS, J., delivered the opinion of the Court, in which all other Members joined, except POWELL, J., who took no part in the decision of the case.

*Gordon Dean Booth, Jr.*, argued the cause for petitioner. With him on the briefs were *William H. Boice, Joseph W. Dorn*, and *Wm. John Kennedy*.

*Raymond C. Fay* argued the cause for respondents. With him on the brief were *Alan M. Serwer* and *Susan D. Goland*.

*Deputy Solicitor General Wallace* argued the cause for the United States et al. as *amici curiae* urging affirmance. With him on the brief were *Solicitor General Lee, Harriet S. Shapiro, Johnny J. Butler*, and *Philip B. Sklover*.*

JUSTICE STEVENS delivered the opinion of the Court.

The petitioner, Western Air Lines, Inc., requires that its flight engineers retire at age 60. Although the Age Discrimination in Employment Act of 1967 (ADEA), 29 U. S. C.

*Briefs of *amici curiae* urging reversal were filed for the Air Line Pilots Association, International, by *Michael E. Abram* and *Jay P. Levy-Warren;* for American Airlines, Inc., by *Richard A. Malahowski;* for Delta Air Lines, Inc., by *James W. Callison, Robert S. Harkey*, and *Thomas J. Kassin;* for the Equal Employment Advisory Council by *Robert E. Williams, Douglas S. McDowell*, and *Thomas R. Bagby;* for Pan American World Airways, Inc., by *Robert S. Venning;* and for Trans World Airlines, Inc., by *Henry J. Oechler, Jr., Donald I. Strauber*, and *Peter N. Hillman*.

Briefs of *amici curiae* urging affirmance were filed for the American Association of Retired Persons by *Alfred Miller* and *Harry P. Cohen;* for the American Civil Liberties Union et al. by *Susan Deller Ross;* and for the Flight Engineers International Association, American Airlines Chapter, AFL–CIO, by *Asher Schwartz* and *David Rosen*.

*Howard C. Eglit* filed a brief for the National Council on the Aging, Inc., et al. as *amici curiae*.

§§ 621–634, generally prohibits mandatory retirement before age 70, the Act provides an exception "where age is a bona fide occupational qualification [BFOQ] reasonably necessary to the normal operation of the particular business."[1] A jury concluded that Western's mandatory retirement rule did not qualify as a BFOQ even though it purportedly was adopted for safety reasons. The question here is whether the jury was properly instructed on the elements of the BFOQ defense.[2]

# I

In its commercial airline operations, Western operates a variety of aircraft, including the Boeing 727 and the McDonnell-Douglas DC–10. These aircraft require three crew members in the cockpit: a captain, a first officer, and a flight engineer. "The 'captain' is the pilot and controls the aircraft. He is responsible for all phases of its operation. The 'first officer' is the copilot and assists the captain. The 'flight engineer' usually monitors a side-facing instrument panel. He does not operate the flight controls unless the captain and the first officer become incapacitated." *Trans World Airlines, Inc.* v. *Thurston,* 469 U. S. 111, 114 (1985).

---

[1] Section 4(f)(1) of the ADEA provides:

"It shall not be unlawful for an employer . . .

"(1) to take any action otherwise prohibited . . . where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business . . . ." 81 Stat. 603, 29 U. S. C. § 623(f)(1).

[2] In *Trans World Airlines, Inc.* v. *Thurston,* 469 U. S. 111 (1985), decided earlier this Term, TWA allowed flight engineers to continue working past age 60, and allowed pilots to downbid to flight engineer positions provided that they were able to find an open position prior to their 60th birthdays. See *id.,* at 115–116. Pilots who were displaced for any reason besides the Federal Aviation Administration's age-60 rule, however, were permitted to "bump" less senior persons occupying flight engineer positions without waiting for vacancies to occur. We held that this transfer policy discriminated among pilots on the basis of age, and violated the ADEA. Since TWA did not impose an under-age-60 qualification for flight engineers, however, it had no occasion to rely on the same BFOQ theory presented here by Western.

A regulation of the Federal Aviation Administration (FAA) prohibits any person from serving as a pilot or first officer on a commercial flight "if that person has reached his 60th birthday." 14 CFR § 121.383(c) (1985). The FAA has justified the retention of mandatory retirement for pilots on the theory that "incapacitating medical events" and "adverse psychological, emotional, and physicial changes" occur as a consequence of aging. "The inability to detect or predict with precision an individual's risk of sudden or subtle incapacitation, in the face of known age-related risks, counsels against relaxation of the rule." 49 Fed. Reg. 14695 (1984). See also 24 Fed. Reg. 9776 (1959).

At the same time, the FAA has refused to establish a mandatory retirement age for flight engineers. "While a flight engineer has important duties which contribute to the safe operation of the airplane, he or she may not assume the responsibilities of the pilot in command." 49 Fed. Reg., at 14694. Moreover, available statistics establish that flight engineers have rarely been a contributing cause or factor in commercial aircraft "accidents" or "incidents." *Ibid.*

In 1978, respondents Criswell and Starley were captains operating DC–10s for Western. Both men celebrated their 60th birthdays in July 1978. Under the collective-bargaining agreement in effect between Western and the union, cockpit crew members could obtain open positions by bidding in order of seniority.[3] In order to avoid mandatory retirement

---

[3] While this lawsuit was proceeding to trial, Criswell and Starley also pursued their remedies under the collective-bargaining agreement. The System Wide Board of Adjustment, over a dissent, ultimately ruled that the contract provision that appeared to authorize the pilots' downbidding was only intended to allow senior pilots operating narrow-body equipment to bid for first officer or flight engineer positions on wide-body aircraft. App. to Pet. for Cert. A84–A90. Since Criswell and Starley were already serving on wide-body aircraft, the provision did not apply to them. The Board also concluded that the provision would not support a transfer "for the obvious purpose of evading the application of [the] agreed retirement plan." *Id.*, at A89. Western relied on this ground in its motion for sum-

under the FAA's under-age-60 rule for pilots, Criswell and Starley applied for reassignment as flight engineers. Western denied both requests, ostensibly on the ground that both employees were members of the company's retirement plan which required all crew members to retire at age 60.[4] For the same reason, respondent Ron, a career flight engineer, was also retired in 1978 after his 60th birthday.

Mandatory retirement provisions similar to those contained in Western's pension plan had previously been upheld under the ADEA. *United Air Lines, Inc.* v. *McMann*, 434 U. S. 192 (1977). As originally enacted in 1967, the Act provided an exception to its general proscription of age discrimination for any actions undertaken "to observe the terms of a . . . bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this Act."[5] In April 1978, however, Congress amended the statute to prohibit employee benefit plans from requiring the involuntary retirement of any employee because of age.[6]

Criswell, Starley, and Ron brought this action against Western contending that the under-age-60 qualification for

mary judgment, but the District Court concluded that material questions of fact remained on the question of whether age was a substantial and determinative factor in the denial of the downbids. *Id.*, at A81.

[4] The Western official who was responsible for the decision to retire the plaintiffs conceded that "the sole basis" for the denial of the applications of Criswell, Starley, and Ron was the same: "the provision in the pension plan regarding retirement at age 60." Tr. 1163. In addition, he admitted that he had "no personal knowledge" of any safety rationale for the under-age-60 rule for flight engineers, *id.*, at 2059, nor had it played any significant role in his decision to retire them. See *id.*, at 61, 2027–2033, 2056–2057. The airline sent Starley and Ron form letters informing them of its "considered judgment after examining all of the applicable statutory law that since you have been a member of our Pilot retirement plan, that we cannot continue your employment beyond the normal retirement date of age 60." See App. 89, 91.

[5] § 4(f)(2), 81 Stat. 603, 29 U. S. C. § 623(f)(2).

[6] 92 Stat. 189, 29 U. S. C. § 623(f)(2).

the position of flight engineer violated the ADEA. In the District Court, Western defended, in part, on the theory that the age-60 rule is a BFOQ "reasonably necessary" to the safe operation of the airline.[7] All parties submitted evidence concerning the nature of the flight engineer's tasks, the physiological and psychological traits required to perform them, and the availability of those traits among persons over age 60.

As the District Court summarized, the evidence at trial established that the flight engineer's "normal duties are less critical to the safety of flight than those of a pilot." 514 F. Supp. 384, 390 (CD Cal. 1981). The flight engineer, however, does have critical functions in emergency situations and, of course, might cause considerable disruption in the event of his own medical emergency.

The actual capabilities of persons over age 60, and the ability to detect disease or a precipitous decline in their faculties, were the subject of conflicting medical testimony. Western's expert witness, a former FAA Deputy Federal Air Surgeon,[8] was especially concerned about the possibility of a "cardiovascular event" such as a heart attack. He testified that "with advancing age the likelihood of onset of disease increases and that in persons over age 60 it could not be predicted whether and when such diseases would occur." *Id.*, at 389.

The plaintiffs' experts, on the other hand, testified that physiological deterioration is caused by disease, not aging, and that "it was feasible to determine on the basis of individual medical examinations whether flight deck crew members, including those over age 60, were physically qualified to con-

---

[7] Western also contended that its denials of the downbids by pilots Starley and Criswell were based on "reasonable factors other than age." 29 U. S. C. § 623(f)(1); see n. 10, *infra*.

[8] Although the witness had served with the FAA for seven years ending in 1979, he conceded that throughout his tenure at the FAA he never had advocated that the agency extend the age-60 rule to flight engineers. Tr. 1521.

tinue to fly." *Ibid.* These conclusions were corroborated by the nonmedical evidence:

"The record also reveals that both the FAA and the airlines have been able to deal with the health problems of pilots on an individualized basis. Pilots who have been grounded because of alcoholism or cardiovascular disease have been recertified by the FAA and allowed to resume flying. Pilots who were unable to pass the necessary examination to maintain their FAA first class medical certificates, but who continued to qualify for second class medical certificates were allowed to 'downgrade' from pilot to [flight engineer]. There is nothing in the record to indicate that these flight deck crew members are physically better able to perform their duties than flight engineers over age 60 who have not experienced such events or that they are less likely to become incapacitated." *Id.*, at 390.

Moreover, several large commercial airlines have flight engineers over age 60 "flying the line" without any reduction in their safety record. *Ibid.*

The jury was instructed that the "BFOQ defense is available only if it is reasonably necessary to the normal operation or essence of defendant's business." Tr. 2626. The jury was informed that "the essence of Western's business is the safe transportation of their passengers." *Ibid.* The jury was also instructed:

"One method by which defendant Western may establish a BFOQ in this case is to prove:

"(1) That in 1978, when these plaintiffs were retired, it was highly impractical for Western to deal with each second officer over age 60 on an individualized basis to determine his particular ability to perform his job safely; and

"(2) That some second officers over age 60 possess traits of a physiological, psychological or other nature

which preclude safe and efficient job performance that cannot be ascertained by means other than knowing their age.

"In evaluating the practicability to defendant Western of dealing with second officers over age 60 on an individualized basis, with respect to the medical testimony, you should consider the state of the medical art as it existed in July 1978." *Id.*, at 2627.

The jury rendered a verdict for the plaintiffs, and awarded damages. After trial, the District Court granted equitable relief, explaining in a written opinion why it found no merit in Western's BFOQ defense to the mandatory retirement rule. 514 F. Supp., at 389–391.[9]

On appeal, Western made various arguments attacking the verdict and judgment below, but the Court of Appeals affirmed in all respects. 709 F. 2d 544 (CA9 1983). In particular, the Court of Appeals rejected Western's contention that the instruction on the BFOQ defense was insufficiently deferential to the airline's legitimate concern for the safety of its passengers. *Id.*, at 549–551. We granted certiorari to consider the merits of this question. 469 U. S. 815 (1984).[10]

---

[9] After the judgment in the *Criswell* action, eight other pilots and one career flight officer filed a separate action seeking similar relief. A preliminary injunction was granted on behalf of the flight engineer, and Western appealed. The Court of Appeals consolidated the appeal with Western's appeal in *Criswell*, and affirmed the preliminary injunction. 709 F. 2d 544, 558–559 (CA9 1983). The plaintiffs in the collateral action are respondents here.

[10] One of Western's claims in the trial court was that its refusal to allow pilots to serve as flight engineers after they reached age 60 was based on "reasonable factors other than age" (RFOA), namely, a facially neutral policy embodied in its collective-bargaining agreement which prohibited downbidding. See nn. 3 and 7, *supra*. The jury rejected this defense in its verdict. On appeal, Western claimed that the instructions had improperly required it to bear the burden of proof on the RFOA issue inasmuch as the burden of persuasion on the issue of age discrimination is at all times on

## II

Throughout the legislative history of the ADEA, one empirical fact is repeatedly emphasized: the process of psychological and physiological degeneration caused by aging varies with each individual. "The basic research in the field of aging has established that there is a wide range of individual physical ability regardless of age."[11]  As a result, many older American workers perform at levels equal or superior to their younger colleagues.

In 1965, the Secretary of Labor reported to Congress that despite these well-established medical facts there "is persistent and widespread use of age limits in hiring that in a great many cases can be attributed only to arbitrary discrimination against older workers on the basis of age and regardless of ability."[12]  Two years later, the President recommended that Congress enact legislation to abolish arbitrary age limits on

---

the plaintiff.  Cf. *Texas Dept. of Community Affairs* v. *Burdine,* 450 U. S. 248 (1981); *Furnco Construction Co.* v. *Waters,* 438 U. S. 567 (1978). The Court of Appeals rejected this claim on the merits.  709 F. 2d, at 552–553.  We granted certiorari to consider the merits of this question, 469 U. S. 815 (1984), but as we read the instructions the burden *was* placed on the plaintiffs on the RFOA issue.  The general instruction on the question of discrimination provided that the "burden of proof is on the plaintiffs to show discriminatory treatment on the basis of age."  App. 58. The instructions expressly informed the jury when the burden shifted to the defendant to prove various issues, *e. g., id.,* at 60 (business necessity); *id.,* at 61 (BFOQ), but did not so inform the jury in the RFOA instruction, *id.,* at 62–63.  Because the plaintiffs were assigned the burden of proof, we need not consider whether it would have been error to assign it to the defendant.

[11] Report of the Secretary of Labor, The Older American Worker: Age Discrimination in Employment 9 (1965) (hereinafter Report), EEOC, Legislative History of the Age Discrimination in Employment Act 26 (1981) (hereinafter Legislative History).  See also S. Rep. No. 95–493, p. 2 (1977), Legislative History 435 ("Scientific research . . . indicates that chronological age alone is a poor indicator of ability to perform a job").

[12] Report, at 21, Legislative History 37.

hiring. Such limits, the President declared, have a devastating effect on the dignity of the individual and result in a staggering loss of human resources vital to the national economy.[13]

After further study,[14] Congress responded with the enactment of the ADEA. The preamble declares that the purpose of the ADEA is "to promote employment of older persons based on their ability rather than age [and] to prohibit arbitrary age discrimination in employment." 81 Stat. 602, 29 U. S. C. § 621(b). Section 4(a)(1) makes it "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 81 Stat. 603, 29 U. S. C. § 623(a)(1). This proscription presently applies to all persons between the ages of 40 and 70. 29 U. S. C. § 631(a).

The legislative history of the 1978 Amendments to the ADEA makes quite clear that the policies and substantive provisions of the Act apply with especial force in the case of mandatory retirement provisions. The House Committee on Education and Labor reported:

"Increasingly, it is being recognized that mandatory retirement based solely upon age is arbitrary and that chronological age alone is a poor indicator of ability to perform a job. Mandatory retirement does not take

---

[13] "Hundreds of thousands not yet old, not yet voluntarily retired, find themselves jobless because of arbitrary age discrimination. Despite our present low rate of unemployment, there has been a persistent average of 850,000 people age 45 and over who are unemployed.

.          .          .          .          .

"In economic terms, this is a serious—and senseless—loss to a nation on the move. But the greater loss is the cruel sacrifice in happiness and well-being which joblessness imposes on these citizens and their families." H. R. Doc. No. 40, 90th Cong., 1st Sess., 7 (1967), Legislative History 61.

[14] See *EEOC* v. *Wyoming,* 460 U. S. 226, 230 (1983).

into consideration actual differing abilities and capacities. Such forced retirement can cause hardships for older persons through loss of roles and loss of income. Those older persons who wish to be re-employed have a much more difficult time finding a new job than younger persons.

"Society, as a whole, suffers from mandatory retirement as well. As a result of mandatory retirement, skills and experience are lost from the work force resulting in reduced GNP. Such practices also add a burden to Government income maintenance programs such as social security." [15]

In the 1978 Amendments, Congress narrowed an exception to the ADEA which had previously authorized involuntary retirement under limited circumstances. See *supra*, at 405.

In both 1967 and 1978, however, Congress recognized that classifications based on age, like classifications based on religion, sex, or national origin, may sometimes serve as a necessary proxy for neutral employment qualifications essential to the employer's business. The diverse employment situations in various industries, however, forced Congress to adopt a "case-by-case basis . . . as the underlying rule in the administration of the legislation." H. R. Rep. No. 805, 90th Cong., 1st Sess., 7 (1967), Legislative History 80. [16] Congress offered only general guidance on when an age clas-

---

[15] H. R. Rep. No. 95–527, pt. 1, p. 2 (1977), Legislative History 362. Cf. S. Rep. No. 95–493, p. 4 (1977), Legislative History 437 ("The committee believes that the arguments for retaining existing mandatory retirement policies are largely based on misconceptions rather than upon a careful analysis of the facts").

[16] "Many different types of employment situations prevail. Administration of this law must place emphasis on case-by-case basis, with unusual working conditions weighed on their own merits. The purpose of this legislation, simply stated, is to insure that age, within the limits prescribed herein, is not a determining factor in a refusal to hire." S. Rep. No. 723, 90th Cong., 1st Sess., 7 (1967), Legislative History 111.

sification might be permissible by borrowing a concept and statutory language from Title VII of the Civil Rights Act of 1964[17] and providing that such a classification is lawful "where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business." 29 U. S. C. § 623(f)(1).

Shortly after the passage of the Act, the Secretary of Labor, who was at that time charged with its enforcement, adopted regulations declaring that the BFOQ exception to the ADEA has only "limited scope and application" and "must be construed narrowly." 33 Fed. Reg. 9172 (1968), 29 CFR § 860.102(b) (1984). The Equal Employment Opportunity Commission (EEOC) adopted the same narrow construction of the BFOQ exception after it was assigned authority for enforcing the statute. 46 Fed. Reg. 47727 (1981), 29 CFR § 1625.6 (1984). The restrictive language of the statute and the consistent interpretation of the administrative agencies charged with enforcing the statute convince us that, like its Title VII counterpart, the BFOQ exception "was in fact meant to be an extremely narrow exception to the general prohibition" of age discrimination contained in the ADEA. *Dothard* v. *Rawlinson*, 433 U. S. 321, 334 (1977).

### III

In *Usery* v. *Tamiami Trail Tours, Inc.*, 531 F. 2d 224 (1976), the Court of Appeals for the Fifth Circuit was called upon to evaluate the merits of a BFOQ defense to a claim of age discrimination. Tamiami Trail Tours, Inc., had a policy of refusing to hire persons over age 40 as intercity bus drivers. At trial, the bus company introduced testimony supporting its theory that the hiring policy was a BFOQ based

---

[17] Section 703(e) of Title VII permits classifications based on religion, sex or national origin in those certain instances "where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U. S. C. § 2000e–2(e)(1).

upon safety considerations—the need to employ persons who have a low risk of accidents. In evaluating this contention, the Court of Appeals drew on its Title VII precedents, and concluded that two inquiries were relevant.

First, the court recognized that some job qualifications may be so peripheral to the central mission of the employer's business that *no* age discrimination can be "reasonably *necessary* to the normal operation of the particular business." [18] 29 U. S. C. § 623(f)(1). The bus company justified the age qualification for hiring its drivers on safety considerations, but the court concluded that this claim was to be evaluated under an objective standard:

> "[T]he job qualifications which the employer invokes to justify his discrimination must be *reasonably necessary* to the essence of his business—here, the *safe* transportation of bus passengers from one point to another. The greater the safety factor, measured by the likelihood of harm and the probable severity of that harm in case of an accident, the more stringent may be the job qualifications designed to insure safe driving." 531 F. 2d, at 236.

This inquiry "adjusts to the safety factor" by ensuring that the employer's restrictive job qualifications are "reasonably necessary" to further the overriding interest in public safety. *Ibid.* In *Tamiami*, the court noted that no one had seriously

---

[18] *Diaz* v. *Pan American World Airways, Inc.*, 442 F. 2d 385 (CA5), cert. denied, 404 U. S. 950 (1971), provided authority for this proposition. In *Diaz* the court had rejected Pan American's claim that a female-only qualification for the position of in-flight cabin attendant was a BFOQ under Title VII. The District Court had upheld the qualification as a BFOQ finding that the airline's passengers preferred the "pleasant environment" and the "cosmetic effect" provided by female attendants, and that most men were unable to perform effectively the "non-mechanical functions" of the job. The Court of Appeals rejected the BFOQ defense concluding that these considerations "are tangential to the essence of the business involved." 442 F. 2d, at 388.

challenged the bus company's safety justification for hiring drivers with a low risk of having accidents.

Second, the court recognized that the ADEA requires that age qualifications be something more than "convenient" or "reasonable"; they must be "reasonably necessary . . . to the particular business," and this is only so when the employer is compelled to rely on age as a proxy for the safety-related job qualifications validated in the first inquiry.[19] This showing could be made in two ways. The employer could establish that it "'had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all [persons over the age qualifications] would be unable to perform safely and efficiently the duties of the job involved.'"[20] In *Tamiami*, the employer did not seek to justify its hiring qualification under this standard.

Alternatively, the employer could establish that age was a legitimate proxy for the safety-related job qualifications by proving that it is "'impossible or highly impractical'" to deal with the older employees on an individualized basis.[21] "One method by which the employer can carry this burden is to establish that some members of the discriminated-against class possess a trait precluding safe and efficient job performance

---

[19] *Weeks* v. *Southern Bell Telephone & Telegraph Co.*, 408 F. 2d 228 (CA5 1969), provided authority for this proposition. In *Weeks* the court rejected Southern Bell's claim that a male-only qualification for the position of switchman was a BFOQ under Title VII. Southern Bell argued, and the District Court had found, that the job was "strenuous," but the court observed that that "finding is extremely vague." *Id.*, at 234. The court rejected the BFOQ defense concluding that "using these class stereotypes denies desirable positions to a great many women perfectly capable of performing the duties involved." *Id.*, at 236. Moreover, the employer had made no showing that it was "impossible or highly impractical to deal with women on an individualized basis." *Id.*, at 235, n. 5.

[20] 531 F. 2d, at 235 (quoting *Weeks* v. *Southern Bell Telephone & Telegraph Co.*, 408 F. 2d, at 235).

[21] 531 F. 2d, at 235 (quoting *Weeks* v. *Southern Bell Telephone & Telegraph Co.*, 408 F. 2d, at 235, n. 5).

that cannot be ascertained by means other than knowledge of the applicant's membership in the class." *Id.,* at 235. In *Tamiami,* the medical evidence on this point was conflicting, but the District Court had found that individual examinations could not determine which individuals over the age of 40 would be unable to operate the buses safely. The Court of Appeals found that this finding of fact was not "clearly erroneous," and affirmed the District Court's judgment for the bus company on the BFOQ defense. *Id.,* at 238.

Congress, in considering the 1978 Amendments, implicitly endorsed the two-part inquiry identified by the Fifth Circuit in the *Tamiami* case. The Senate Committee Report expressed concern that the amendment prohibiting mandatory retirement in accordance with pension plans might imply that mandatory retirement could not be a BFOQ:

> "For example, in certain types of particularly arduous law enforcement activity, there may be a factual basis for believing that substantially all employees above a specified age would be unable to continue to perform safely and efficiently the duties of their particular jobs, and it may be impossible or impractical to determine through medical examinations, periodic reviews of current job performance and other objective tests the employees' capacity or ability to continue to perform the jobs safely and efficiently.
>
> "Accordingly, the committee adopted an amendment to make it clear that where these two conditions are satisfied and where such a bona fide occupational qualification has therefore been established, an employer may lawfully require mandatory retirement at that specified age." S. Rep. No. 95–493, pp. 10–11 (1977), Legislative History 443–444.

The amendment was adopted by the Senate, but deleted by the Conference Committee because it "neither added to nor

worked any change upon present law." [22]    H. R. Conf. Rep. No. 95–950, p. 7 (1978), Legislative History 518.

Every Court of Appeals that has confronted a BFOQ defense based on safety considerations has analyzed the problem consistently with the *Tamiami* standard. [23]    An EEOC regulation embraces the same criteria. [24]    Considering the narrow language of the BFOQ exception, the parallel treatment of such questions under Title VII, and the uniform application of the standard by the federal courts, the EEOC, and Congress, we conclude that this two-part inquiry prop-

---

[22] Senator Javits, an active proponent of the legislation, obviously viewed the BFOQ defense as a narrow one when he explained that it could be proved when "the employer can demonstrate that there is an objective, factual basis for believing that virtually all employees above a certain age are unable to safely perform the duties of their jobs and where, in addition, there is no practical medical or performance test to determine capacity." 123 Cong. Rec. 34319 (1977), Legislative History 506.    See also H. R. Rep. No. 95–527, pt. 1, p. 12, Legislative History 372.

[23] See, *e. g.*, *Monroe* v. *United Air Lines, Inc.*, 736 F. 2d 394 (CA7 1984), cert. denied, 470 U. S. 1004 (1985); *Johnson* v. *American Airlines, Inc.*, 745 F. 2d 988, 993–994 (CA5 1984), cert. pending, No. 84–1271; 709 F. 2d, at 550 (case below); *Orzel* v. *City of Wauwatosa Fire Dept.*, 697 F. 2d 743, 752–753 (CA7), cert. denied, 464 U. S. 992 (1983); *Tuohy* v. *Ford Motor Co.*, 675 F. 2d 842, 844–845 (CA6 1982); *Smallwood* v. *United Air Lines, Inc.*, 661 F. 2d 303, 307 (CA4 1981), cert. denied, 456 U. S. 1007 (1982); *Arritt* v. *Grisell*, 567 F. 2d 1267, 1271 (CA4 1977).    Cf. *Harriss* v. *Pan American World Airways, Inc.*, 649 F. 2d 670, 676–677 (CA9 1980) (Title VII).

[24] 46 Fed. Reg. 47727 (1981), 29 CFR § 1625.6(b) (1984):

"An employer asserting a BFOQ defense has the burden of proving that (1) the age limit is reasonably necessary to the essence of the business, and either (2) that all or substantially all individuals excluded from the job involved are in fact disqualified, or (3) that some of the individuals so excluded possess a disqualifying trait that cannot be ascertained except by reference to age.    If the employer's objective in asserting a BFOQ is the goal of public safety, the employer must prove that the challenged practice does indeed effectuate that goal and that there is no acceptable alternative which would better advance it or equally advance it with less discriminatory impact."

erly identifies the relevant considerations for resolving a BFOQ defense to an age-based qualification purportedly justified by considerations of safety.

## IV

In the trial court, Western preserved an objection to any instruction in the *Tamiami* mold, claiming that "any instruction pertaining to the statutory phrase 'reasonably necessary to the normal operation of [defendant's] business' . . . is irrelevant to and confusing for the deliberations of the jury." [25] Western proposed an instruction that would have allowed it to succeed on the BFOQ defense by proving that "in 1978, when these plaintiffs were retired, there existed a *rational basis in fact* for defendant to believe that use of [flight engineers] over age 60 on its DC-10 airliners would increase the likelihood of risk to its passengers." [26] The proposed instruction went on to note that the jury might rely on the FAA's age-60 rule for pilots to establish a BFOQ under this standard "without considering any other evidence." [27] It also noted that the medical evidence submitted by the parties might provide a "rational basis in fact."

On appeal, Western defended its proposed instruction, and the Court of Appeals soundly rejected it. 709 F. 2d, at 549–551. In this Court, Western slightly changes its course.

---

[25] Record, Doc. No. 164 (objections to plaintiffs proposed BFOQ instruction).

[26] *Ibid.* (Defendant's Proposed Instruction No. 19) (emphasis added). In support of the "rational basis in fact" language in the proposed instruction Western cited language in the Seventh Circuit's opinion in *Hodgson* v. *Greyhound Lines, Inc.*, 499 F. 2d 859 (1974), cert. denied, 419 U. S. 1122 (1975), which had been criticized by the Fifth Circuit panel in *Tamiami* and which the Seventh Circuit later repudiated. *Orzel* v. *City of Wauwatosa Fire Dept.*, 697 F. 2d, at 752–753. Western also relied on the District Court's opinion in *Tuohy* v. *Ford Motor Co.*, 490 F. Supp. 258 (ED Mich. 1980), which was reversed on appeal, 675 F. 2d 842 (CA6 1982).

[27] Record, Doc. No. 164 (Defendant's Proposed Instruction No. 19.1).

The airline now acknowledges that the *Tamiami* standard identifies the relevant general inquiries that must be made in evaluating the BFOQ defense. However, Western claims that in several respects the instructions given below were insufficiently protective of public safety. Western urges that we interpret or modify the *Tamiami* standard to weigh these concerns in the balance.

*Reasonably Necessary Job Qualifications*

Western relied on two different kinds of job qualifications to justify its mandatory retirement policy. First, it argued that flight engineers should have a low risk of incapacitation or psychological and physiological deterioration. At this vague level of analysis respondents have not seriously disputed—nor could they—that the qualification of good health for a vital crew member is reasonably necessary to the essence of the airline's operations. Instead, they have argued that age is not a necessary proxy for that qualification.

On a more specific level, Western argues that flight engineers must meet the same stringent qualifications as pilots, and that it was therefore quite logical to extend to flight engineers the FAA's age-60 retirement rule for pilots. Although the FAA's rule for pilots, adopted for safety reasons, is relevant evidence in the airline's BFOQ defense, it is not to be accorded conclusive weight. *Johnson* v. *Mayor and City Council of Baltimore, ante,* at 370–371. The extent to which the rule is probative varies with the weight of the evidence supporting its safety rationale and "the congruity between the . . . occupations at issue." *Ante,* at 371. In this case, the evidence clearly established that the FAA, Western, and other airlines all recognized that the qualifications for a flight engineer were less rigorous than those required for a pilot.[28]

---

[28] As the Court of Appeals noted, the "jury heard testimony that Western itself allows a captain under the age of sixty who cannot, for health reasons, continue to fly as a captain or co-pilot to downbid to a position as

In the absence of persuasive evidence supporting its position, Western nevertheless argues that the jury should have been instructed to defer to "Western's selection of job qualifications for the position of [flight engineer] that are reasonable in light of the safety risks." Brief for Petitioner 30. This proposal is plainly at odds with Congress' decision, in adopting the ADEA, to subject such management decisions to a test of objective justification in a court of law. The BFOQ standard adopted in the statute is one of "reasonable necessity," not reasonableness.

In adopting that standard, Congress did not ignore the public interest in safety. That interest is adequately reflected in instructions that track the language of the statute. When an employer establishes that a job qualification has been carefully formulated to respond to documented concerns for public safety, it will not be overly burdensome to persuade a trier of fact that the qualification is "reasonably necessary" to safe operation of the business. The uncertainty implicit in the concept of managing safety risks always makes it "reasonably necessary" to err on the side of caution in a close case.[29] The employer cannot be expected to establish the risk of an airline accident "to a certainty, for certainty would require running the risk until a tragic accident would

second officer. [In addition,] half the pilots flying in the United States are flying for major airlines which do not require second officers to retire at the age of sixty, and . . . there are over 200 such second officers currently flying on wide-bodied aircraft." 709 F. 2d, at 552. See also *supra*, at 406–407.

[29] Several Courts of Appeals have recognized that safety considerations are relevant in making or reviewing findings of fact. See, *e. g.*, *Levin v. Delta Air Lines, Inc.*, 730 F. 2d 994, 998 (CA5 1984); *Orzel v. City of Wauwatosa Fire Dept.*, 697 F. 2d, at 755; *Tuohy v. Ford Motor Co.*, 675 F. 2d, at 845; *Murnane v. American Airlines, Inc.*, 215 U. S. App. D. C. 55, 58, 667 F. 2d 98, 101 (1981), cert. denied, 456 U. S. 915 (1982); *Hodgson v. Greyhound Lines, Inc.*, 499 F. 2d, at 863. Such considerations, of course, are only relevant at the margin of a close case, and do not relieve the employer from its burden of establishing the BFOQ by the preponderance of credible evidence.

prove that the judgment was sound." *Usery* v. *Tamiami Trail Tours, Inc.,* 531 F. 2d, at 238. When the employer's argument has a credible basis in the record, it is difficult to believe that a jury of laypersons—many of whom no doubt have flown or could expect to fly on commercial air carriers— would not defer in a close case to the airline's judgment. Since the instructions in this case would not have prevented the airline from raising this contention to the jury in closing argument, we are satisfied that the verdict is a consequence of a defect in Western's proof rather than a defect in the trial court's instructions.[30]

### Western's Statutory Safety Obligation

The instructions defined the essence of Western's business as "the safe transportation of their passengers." Tr. 2626. Western complains that this instruction was defective because it failed to inform the jury that an airline must conduct its operations "with the highest possible degree of safety."[31]

Jury instructions, of course, "may not be judged in artificial isolation," but must be judged in the "context of the overall charge" and the circumstances of the case. See *Cupp* v. *Naughten,* 414 U. S. 141, 147 (1973). In this case, the instructions characterized safe transportation as the "essence"

---

[30] Moreover, we do not find that petitioner's proposed instructions made any reference to the notion of deference to the expertise of the employer, except insofar as that concept was implicit in the "rational basis in fact" standard reflected in its proposed instructions. As we reject that standard as inconsistent with the statute, *infra,* at 421–423, we are somewhat reluctant to fault the trial judge for not giving an instruction that was not requested.

[31] This standard is set forth in the Federal Aviation Act, which provides, in part:

"In prescribing standards, rules, and regulations, and in issuing certificates under this subchapter, the Secretary of Transportation shall give full consideration to the duty resting upon air carriers to perform their services with *the highest possible degree of safety* in the public interest . . . ." 49 U. S. C. App. § 1421(b) (emphasis added).

of Western's business and specifically referred to the importance of "safe and efficient job performance" by flight engineers. Tr. 2627. Moreover, in closing argument counsel pointed out that because "safety is the essence of Western's business," the airline strives for "the highest degree possible of safety." [32] Viewing the record as a whole, we are satisfied that the jury's attention was adequately focused on the importance of safety to the operation of Western's business. Cf. *United States* v. *Park*, 421 U. S. 658, 674 (1975).

*Age as a Proxy for Job Qualifications*

Western contended below that the ADEA only requires that the employer establish "a rational basis in fact" for believing that identification of those persons lacking suitable qualifications cannot occur on an individualized basis. [33] This "rational basis in fact" standard would have been tantamount to an instruction to return a verdict in the defendant's favor. Because that standard conveys a meaning that is significantly different from that conveyed by the statutory phrase "reasonably necessary," it was correctly rejected by the trial court. [34]

---

[32] "We have tried to present, throughout the case, our view that safety is the essence of Western's business. It is the core, it is what the air passenger service business is all about. We have a duty to our passengers, which we consider to be the most important duty of all the business operations that we engage in, including making money. Our first duty is that the passengers and the crews on all our aircraft are safe. And we attempt to render to them the highest degree possible of safety." Tr. 2514.

[33] In this Court Western proposes a "factual basis" standard. We do not perceive any substantial difference between this standard and the instruction that it sought below, and we discuss the question as it was raised in the proposed instructions, and discussed in the Court of Appeals.

[34] This standard has been rejected by nearly every court to consider it. 709 F. 2d, at 550–551 (case below); *Orzel* v. *City of Wauwatosa Fire Dept.*, 697 F. 2d, at 755–756; *Tuohy* v. *Ford Motor Co.*, 675 F. 2d, at 845; *Harriss* v. *Pan American World Airways, Inc.*, 649 F. 2d, at 677; *Arritt* v. *Grisell*, 567 F. 2d, at 1271; *Usery* v. *Tamiami Trail Tours, Inc.*, 531 F. 2d, at 235–236.

Western argues that a "rational basis" standard should be adopted because medical disputes can never be proved "to a certainty" and because juries should not be permitted "to resolve bona fide conflicts among medical experts respecting the adequacy of individualized testing." Reply Brief for Petitioner 9, n. 10. The jury, however, need not be convinced beyond all doubt that medical testing is impossible, but only that the proposition is true "on a preponderance of the evidence." Moreover, Western's attack on the wisdom of assigning the resolution of complex questions to 12 laypersons is inconsistent with the structure of the ADEA. Congress expressly decided that problems involving age discrimination in employment should be resolved on a "case-by-case basis" by proof to a jury.[35]

The "rational basis" standard is also inconsistent with the preference for individual evaluation expressed in the language and legislative history of the ADEA.[36] Under the Act, employers are to evaluate employees between the ages of 40 and 70 on their merits and not their age. In the BFOQ defense, Congress provided a limited exception to this general principle, but required that employers validate any discrimination as "reasonably necessary to the normal operation of the particular business." It might well be "rational" to require mandatory retirement at *any* age less than 70, but that result would not comply with Congress' direction that employers must justify the rationale for the age chosen. Unless an employer can establish a substantial basis for believing that all or nearly all employees above an age lack the qualifications required for the position, the age selected for mandatory retirement less than 70 must be an age at which it

---

[35] *Supra*, at 411, and n. 16; 29 U. S. C. § 626(c)(2); *Lorillard* v. *Pons*, 434 U. S. 575 (1978).

[36] Indeed, under a "rational basis" standard a jury might well consider that its "inquiry is at an end" with an expert witness' articulation of any "plausible reaso[n]" for the employer's decision. Cf. *United States Railroad Retirement Board* v. *Fritz*, 449 U. S. 166, 179 (1980).

is highly impractical for the employer to insure by individual testing that its employees will have the necessary qualifications for the job.

Western argues that its lenient standard is necessary because "where qualified experts disagree as to whether persons over a certain age can be dealt with on an individual basis, an employer must be allowed to resolve that controversy in a conservative manner." Reply Brief for Petitioner 8–9. This argument incorrectly assumes that all expert opinion is entitled to equal weight, and virtually ignores the function of the trier of fact in evaluating conflicting testimony. In this case, the jury may well have attached little weight to the testimony of Western's expert witness. See *supra*, at 406, and n. 8. A rule that would require the jury to defer to the judgment of any expert witness testifying for the employer, no matter how unpersuasive, would allow some employers to give free reign to the stereotype of older workers that Congress decried in the legislative history of the ADEA.

When an employee covered by the Act is able to point to reputable businesses in the same industry that choose to eschew reliance on mandatory retirement earlier than age 70, when the employer itself relies on individualized testing in similar circumstances, and when the administrative agency with primary responsibility for maintaining airline safety has determined that individualized testing is not impractical for the relevant position, the employer's attempt to justify its decision on the basis of the contrary opinion of experts—solicited for the purposes of litigation—is hardly convincing on any objective standard short of complete deference. Even in cases involving public safety, the ADEA plainly does not permit the trier of fact to give complete deference to the employer's decision.

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE POWELL took no part in the decision of this case.