EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, Plaintiff,

v.

STATE of Florida, DEPARTMENT OF
HIGHWAY SAFETY AND MOTOR
VEHICLES; and Division of Florida
Highway Patrol, Defendants.

No. TCA 84–7039–WS.

United States District Court,
N.D. Florida,
Tallahassee Division.

Feb. 10, 1986.

J. Kenneth L. Morse, Stanley Kiszkiel,
Miami, Fla., for EEOC.

Rob Henderson, Swann & Haddock, P.A.,
Tallahassee, Fla., Frank Kruppenbacher,
Swann & Haddock, P.A., Orlando, Fla., for
State of Fla., et al.

## ORDER

STAFFORD, Chief Judge.

Plaintiff Equal Employment Opportunity
Commission (EEOC) brought this suit
against the State of Florida; Department
of Highway Safety and Motor Vehicles;
and Division of Florida Highway Patrol.
EEOC alleges that the Florida Highway
Patrol (FHP) violates the Age Discrimina-
tion in Employment Act of 1967 (ADEA),
29 U.S.C. §§ 621–634, by requiring its offi-
cers to retire at age 62.

This court previously granted summary
judgment in favor of the plaintiff EEOC on
a number of issues (document 91). Be-
cause several issues were resolved by sum-
mary judgment, and others were not in
dispute, only one issue remained to be
tried: the issue of whether the Florida
Highway Patrol's mandatory retirement
age is a bona fide occupational qualification
(BFOQ).

A trial on this issue was held from Sep-
tember 16th to 19th, 1985. After consider-
ing the evidence presented, the relevant
case law and the arguments of counsel,
this court concluded that the mandatory
retirement age was not a BFOQ. Pursuant
to Rule 52(a), Federal Rules of Civil Proce-

dure, the court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

(1) The charging party in this case is Lieutenant R.K. Doyle. Lt. Doyle was a permanent employee of the Florida Highway Patrol from 1953 until 1982, when he was forced to retire at the age of 62. At the time of trial, Lt. Doyle was 65 years old. He testified that his current physical condition was excellent, that he exercises regularly, and that he was capable of performing all the duties of an FHP trooper. During the trial, he appeared to be physically fit, alert, and in good health.

(2) Lt. Doyle was forced to retire in 1982 because of FHP's mandatory retirement policy. Under that policy all uniformed officers of FHP are required to retire at the age of 62. This policy is mandated by Florida Statutes § 321.04(4).

(3) FHP asserts that the mandatory retirement age is necessary to protect the public. Colonel Bobby R. Burkett, Director of the Florida Highway Patrol, explained that the mandatory retirement age was necessary because older officers are unable to perform all the tasks required of FHP troopers. Burkett stated that, in the interest of public safety, every trooper must be capable of performing even the most physically demanding duties of an FHP officer. However, it has been Burkett's experience that most older troopers try to "adapt to the system" and avoid dangerous, difficult or stressful situations. For this reason, Burkett believes that troopers should be forced to retire at an even earlier age than 62. He would prefer that the mandatory retirement age be lowered to 55.

(4) The "essence" of FHP's business is the protection of the motoring public in Florida. Accordingly, it is the responsibility of FHP troopers to patrol Florida's highways and enforce the state's laws, particularly those dealing with motor vehicles. As part of their responsibility, troopers must be prepared to respond to any situation that arises.

The job of a trooper can include everything from issuing traffic citations to apprehending felons. While much of the job involves relatively sedentary activities such as driving and filing paperwork, there are some stressful and physically demanding aspects of the work. Troopers generally travel and work alone. In emergencies, they receive backup from other troopers and local law enforcement officials, but sometimes this help is far away from where it is needed. Troopers are sometimes required to push disabled vehicles off the road (although this can frequently be accomplished using the patrol cars, which are equipped with bumpers designed for this purpose). At accident scenes, troopers must sometimes extricate injured persons from automobiles. In emergency situations, they are sometimes called in to assist local law enforcement in quelling civil disturbances and sometimes troopers are required to chase suspects on foot.

However, these physically demanding activities seem to be the exception rather than the rule for FHP troopers. For example, Colonel Burkett testified that felony arrests are among the most dangerous and stressful of all trooper activities. But the total number of these arrests in 1984 was 3500—or an average of less than three arrests each for FHP's 1510 uniformed officers. In addition, there was no evidence that every felony arrest involves stressful or strenuous activity.

(5) There are numerous ranks in the FHP—from patrolman to colonel. As troopers go higher in rank they spend a larger amount of time in supervisory and administrative duties. However, FHP policy requires that every uniformed officer must always be able to perform all functions of a patrol trooper. Colonel Burkett testified that he has made arrests while on patrol, and he expects all of his officers, whatever their rank, to do the same. There is no need, therefore, for the court to consider the individual job requirements of every rank in determining if a mandatory retirement age is appropriate. The duties of all uniformed officers are the same; as a result, if mandatory retirement is appropriate for one rank, it is appropriate for all.

(6) Although there was testimony concerning certain "light duty jobs" for FHP troopers—there are no permanent light duty assignments in the Florida Highway Patrol. Positions such as "Public Information Officer" or "School Bus Inspector" are not considered light duty assignments because troopers assigned to such positions must still perform all the regular duties of FHP troopers.

(7) EEOC has argued that FHP cannot rely on the BFOQ exception because it has no established fitness qualification for FHP troopers. The court finds, however, that FHP does have an established physical fitness requirement. FHP's policy manual clearly states that all troopers "are required to maintain a level of physical fitness which will allow them to perform their duties effectively." Chapter 5.02.00, *Florida Highway Patrol Policy Manual* (defendants' exhibit 45).

(8) Colonel Burkett testified that compliance with the physical fitness requirement is monitored by members of his staff. These staff members notify him of officers who have fitness problems that interfere with their ability to perform the duties of a trooper. Thus, Burkett claims that there is a measurable standard for fitness on the job, and that standard is whatever level of fitness is required of each individual trooper in order to satisfactorily perform the job.

(9) FHP's alleged factual basis for its contention that all or substantially all of the troopers over age 62 could not perform their job lies in the testimony of the two expert witnesses called by FHP.

Dr. Alexander Lind is an expert on physiology, the study of the normal function of organs and body tissue. It was his opinion that all or substantially all people over age 62 could not perform the duties of an FHP trooper safely and efficiently. It was Dr. Lind's opinion that troopers would need an anaerobic capacity of at least 3.0 liters to perform their job safely and efficiently. He relied on several studies to show that only 25% of all persons over the age of 62 could achieve such a capacity. However, his testimony was undercut by the fact that

most females because of their size could never achieve a 3.0 liter capacity. Yet, FHP does have female troopers and Colonel Burkett testified that the female troopers are performing their jobs safely and efficiently.

Dr. Lind also testified that performance levels for all physiological functions decline as a person grows older. For example, muscle strength peaks during a person's late twenties, then declines approximately 30% through the sixties. In addition, Dr. Lind testified about declines in hearing acuity, response to exercise, flexibility, aerobic and anaerobic capacity which occur as a person gets older. Dr. Lind admitted that much of his testimony was common sense—and that physiologists merely quantify the decline.

The court agrees with Dr. Lind that it does not need expert testimony to be convinced that the physical abilities of people decline with age. Indeed, this seems to be the sort of fact which could be judicially noticed as one not subject to dispute because it is generally known. Rule 201(b), Federal Rules of Evidence. Dr. Lind's testimony sought to quantify an average rate of decline. However, even the value of this testimony is questionable in light of the fact that Dr. Lind did not gather data independently; nor did he analyze the raw data from any other study. Instead, he compiled the results of several studies to reach his own averages. Dr. Mostardi and Dr. Leon, the expert witnesses who testified on behalf of the plaintiffs, stated that Dr. Lind had not used an appropriate method of compiling his figures. The preferred method would have been to use the raw data from other studies and then develop a regression equation.

(10) FHP relied on another expert witness, Dr. Albert Antlitz, to testify that troopers over the age of 62 could not safely and efficiently perform the duties of an FHP trooper. Dr. Antlitz based his opinion on the effect of coronary disease on older troopers. He also stated that individual testing of older troopers would be impossible or highly impractical. These opinions were based upon Dr. Antlitz's consideration

of the nature of the duties of an FHP trooper and the nature of coronary disease. Dr. Antlitz stated that the nature of the work is very stressful because of the life threatening situations which sometimes occur. He further testified that this stress, or participation in strenuous activity as is sometimes required could lead to a coronary event. It was also Dr. Antlitz's testimony that the risk of a coronary event increases with age, because coronary artery disease occurs more frequently as people grow older. Specifically, Dr. Antlitz pointed to studies which show that the death rate for heart disease in white males age 55–64 is 80 times higher than for white males age 25–34 (defendants' exhibit 6). Dr. Antlitz provided the court with a number of other studies showing the correlation between age and heart disease (defendants' exhibits 7, 8, 9, 10, 11, 13, 14) which the defendants rely on for their claim that all or substantially all people over the age of 62 are not capable of performing the job.

As in the case of Dr. Lind, the court finds this evidence useful but not conclusive. Both Dr. Antlitz and Dr. Leon agree there are other factors which must be considered in determining the risk of heart disease and coronary events. These factors include gender, family history, cholesterol level, blood pressure, blood sugar level, personality type and life habits such as diet, exercise, smoking and use of alcohol. FHP considers none of these factors in determining which troopers are able to perform their duties.

Dr. Antlitz urges that age is the most important of these risk factors—and that after age 55 the other factors become irrelevant because the level of heart disease in all people is so high at that age. But these assertions were undercut by the testimony of Dr. Leon and by the studies that Dr. Antlitz himself relied upon. Defendants' exhibit 11 is a study of the effects of aging that Dr. Antlitz relied upon heavily for his assertion that age is the most important risk factor used to predict heart disease. Yet that monograph makes it clear that the study only deals with the effects of aging "when both clinical and occult disease has been eliminated, and when life style varia-

bles are fairly homogeneous." Lakatta, *Realities and Myths of an "Aging Process" in the Heart*, p. 6 (defendants' exhibit 11).

Moreover, Dr. Leon testified that recent studies show that cholesterol levels are the most accurate predictors of heart disease. This is important in this case since such levels can be measured and evaluated on an individual basis. Of course, most of the other risk factors are also measurable—and therefore are capable of being used in an individual testing program to measure risk of heart disease in FHP troopers regardless of age.

(11) FHP has no regular program for testing the physical fitness or medical health of its troopers. The only time troopers are subjected to a medical exam is at the time of their initial hiring. After that, FHP only monitors two aspects of a trooper's ability to perform his/her duties. Troopers are checked once a month to be certain they are not overweight; and they are given a firearms test every six months to see if they have the finger strength necessary to pull a trigger. A person could enter on duty at age 22 and serve as an FHP trooper for 40 years without a physical examination of any kind.

(12) Dr. Richard Mostardi is a biology professor who has developed physical fitness hiring standards for the police department in Akron, Ohio. He has studied police procedures and the physical fitness requirements of police officers. Dr. Mostardi testified that older troopers are frequently better able to handle the stressful and physically demanding aspects of police work than their younger counterparts. Although younger police officers may have higher levels of fitness, Dr. Mostardi reports that the experience and maturity of older officers allows them to use better strategy and develop tactical solutions to problems. Therefore, while a younger trooper may have more strength and physical ability, older troopers will frequently be able to perform more safely and efficiently in stressful and demanding situations.

(13) There was considerable dispute between the parties about the usefulness of individual testing in determining the abilities of troopers. Dr. Leon and Dr. Mostardi both stated that testing was feasible. They each outlined a series of tests that could be performed if FHP was concerned about the physical fitness of its troopers. The tests they suggested, such as a periodic medical exam and an EKG, need not be complex or expensive. Dr. Lind admitted that individual testing was a feasible alternative to a mandatory retirement age but expressed concern that the tests would be expensive. Only Dr. Antlitz insisted that individual testing would not be a feasible alternative. He stated the only effective test for heart disease is a cardiac cathetrization, and that such a procedure is too intrusive to be used as a routine testing device. The court agrees that such a procedure is too intrusive; but, the evidence suggests that most heart disease could be detected using less intrusive testing procedures together with an analysis of coronary risk factors.

## CONCLUSIONS OF LAW

(1) This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1337, 1343, 1345 and 29 U.S.C. §§ 216(c), 217, and 626(b).

(2) As explained in this court's order granting partial summary judgment (document 91), plaintiffs have met their initial burden of presenting a *prima facie* violation of the Age Discrimination in Employment Act (ADEA). EEOC is authorized to bring this action and has met all requirements for doing so. Each of the defendants is an employee within the meaning of the ADEA. Defendants require all uniformed officers of the Florida Highway Patrol to retire at age 62.

(3) Defendants assert a single affirmative defense to the plaintiffs' claims. FHP urges that the mandatory retirement age is a bona fide occupational qualification (BFOQ). Title 29, United States Code, § 623(f)(1) provides that age based discrimination is not unlawful if age is a "bona fide occupational qualification reasonably neces-

sary to the normal operation of the particular business." However, this BFOQ exception is an "extremely narrow exception to the general prohibition of age discrimination contained in the ADEA." *Western Air Lines, Inc. v. Criswell*, 472 U.S. 400, 412, 105 S.Ct. 2743, 2751, 86 L.Ed.2d 321 (1985).

■ (4) In order to rely on the BFOQ exception to the ADEA, the defendants must first show that there is a job qualification that is reasonably necessary to the essence of FHP's business. *Criswell*, 472 U.S. at 412, 105 S.Ct. at 2743; *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224, 236 (5th Cir.1976). In this case, the "essence" of FHP's business is assuring the safety of Florida's motoring public. In order to protect the public, FHP argues that all troopers must be capable of performing all physical requirements of the job. Thus, the occupational qualification relied upon is good physical fitness. Although plaintiffs point out that FHP has no measurable standard, they do not seriously argue that physical fitness is not necessary for FHP troopers. Therefore, the court concludes that FHP has shown that there is a qualification reasonably necessary to its operations. That qualification is clearly stated in Chapter 5.02.00 of FHP's policy manual (defendants' exhibit 45). The manual states that all troopers "are required to maintain *a level of physical fitness which will allow them to perform their duties effectively.*" (emphasis added).

(5) Having established the necessary qualification, FHP must next show that it is compelled to rely on age as a proxy for that qualification. This showing can be made in two ways. FHP could show that it "had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all [persons over the age of 62] would be unable to perform safely and efficiently the duties of the job involved." *Tamiami*, 531 F.2d at 235 (quoting *Weeks v. Southern Bell Telephone & Telegraph Co.*, 408 F.2d 228, 235 (5th Cir.1969)). Alternately, FHP could show that age is an appropriate proxy for the physical fitness requirement by proving that it is "impossi-

ble or highly impractical" to deal with the older employees on an individualized basis. *Tamiami*, 531 F.2d at 235. FHP has failed to prove that it had a reasonable, factual basis for believing that all or substantially all persons over the age of 62 are unable to perform the duties of a trooper safely and efficiently. As explained in the court's findings of fact, all the defendants have shown is that there is a factual basis for believing that, on the average, a person's level of health and physical fitness declines with age.

Dr. Lind, the physiologist who testified on behalf of the defendants, testified that all troopers would need an anaerobic capacity of 3.0 liters in order to safely and efficiently perform their job. Even assuming such a standard is required, FHP fails to meet its burden of showing all or substantially all persons over age 65 cannot meet the standard. Dr. Lind, FHP's own expert, admitted that 25% of all persons over 62 could achieve such a capacity.

More importantly, this 3.0 liter capacity is not the appropriate standard upon which to base the court's decision. FHP has not adopted such a qualification. Instead, FHP's standard is that troopers must maintain "a level of physical fitness which will allow them to perform their duties effectively." *FHP Policy Manual*, Chapter 5.02.00. Such a standard necessarily requires the evaluation of abilities on an individual basis, since different people may require a different level of fitness in order to perform effectively. For example, Dr. Mostardi's studies with the police department in Akron, Ohio, show that officers whose age ranged from 20 to 69 were all performing their duties satisfactorily, despite the fact that their physical fitness levels declined with age. Similarly, FHP has found that its female recruits are performing satisfactorily, despite the fact that, as a general rule, females will have a lower anaerobic capacity.

FHP also relied on the testimony of Dr. Antlitz, a cardiologist, who stated that troopers over age 62 could not safely or efficiently perform their job because of the danger of a coronary event. While Dr. Antlitz testified that over 60% of all persons over the age of 62 have heart disease which could lead to a coronary event, the court must necessarily conclude that up to 40% of the people over 62 are not at risk of a coronary event. Therefore, this court cannot conclude that all or substantially all persons over the age of 62 cannot perform the duties of an FHP trooper safely and efficiently.

(7) FHP has also failed to prove that it is impossible or highly impractical to deal with older employees on an individual basis. Other than discussion about the extra cost involved, there was no testimony that would lead this court to conclude that testing the level of physical fitness of FHP troopers would be impossible or highly impractical.

The Fifth Circuit has stated that an employer could carry its burden of proving the impracticality of dealing with older employees on an individual basis by establishing "that some members of the discriminated-against class possess a trait precluding safe and efficient job performance that cannot be ascertained by means other than knowledge of the applicant's membership in the class." *Tamiami*, 531 F.2d at 235. FHP has attempted to make such a showing by claiming that it can only rely on age as a predictor of heart disease in FHP troopers, and that heart disease would preclude safe and efficient job performance. This claim must be rejected for two reasons. First, age is not the only predictor of heart disease. As explained in the findings of fact, there are a number of risk factors to be considered. In fact, the most recent studies suggest that serum cholesterol level—not age—is the most reliable predictor of heart disease.

Second, the court is not convinced that heart disease would preclude safe and efficient job performance. FHP has not argued that heart disease leads to inefficient performance—only that it is unsafe for troopers because of the danger of a coronary event. Yet it must be remembered that FHP does not argue that retirement at age 62 should be mandatory in order to keep its troopers safe; that is not the es-

sence of FHP's operations. The essence of FHP's business is maintaining the safety of Florida's motoring public, and the risk of a coronary event does not necessarily endanger the public. As explained by the Seventh Circuit in *Heiar v. Crawford County*, 746 F.2d 1190 (7th Cir.1984), "It is one thing for a pilot to collapse at the controls of a plane and another thing for a bookkeeper to collapse while entering debits in a ledger." Obviously the officers of FHP are somewhere between these two extremes, but this court cannot conclude that troopers are so much like pilots that the risk of heart disease in troopers is a threat to the safety of the motoring public in Florida.

(8) Finally, and perhaps most telling, is the fact that despite all its claims of concern about the physical fitness of troopers, FHP does not even require troopers to undergo any physical examination once they are employed. The Seventh Circuit found such evidence was very important in determining whether a mandatory retirement age was reasonably necessary:

> [A] telling bit of evidence that mandatory retirement at age 55 is not "reasonably necessary" is that the Crawford County Sheriff's department does not require deputy sheriffs to take annual or other periodic physical examinations at any age, even though many people develop heart disease, spinal-disc disease, or other conditions that disable them from hazardous physical activities long before they reach 55.... Since such examinations are useful both in spotting existing physical disabilities and in identifying high-risk individuals, they are required by most employers who are seriously concerned with the physical fitness of their employees—airlines and the armed forces being the familiar examples. If Crawford County required such examinations it could argue ... that this showed the genuiness of its concern with the physical fitness of its deputy sheriffs; and this in turn would be an argument for a mandatory retirement age since we have said physical examinations are not infallible tests of continuing fitness. But

the premise is missing; the County does not require examinations.

*Heiar*, 746 F.2d at 1199. Similarly, since FHP has no requirements for physical exams, this court must question whether retirement at age 62 for reasons of physical fitness is reasonably necessary to FHP's operations.

■ (9) FHP has failed to prove that its mandatory retirement age is a bona fide occupational qualification. Accordingly, this court must conclude that FHP is liable to the plaintiffs for violation of the Age Discrimination in Employment Act.

(10) Any conclusions of law which also constitute findings of fact are so adopted.

## CONCLUSION

The Florida Highway Patrol has a distinguished record of dedicated public service. The court is confident that FHP's mandatory retirement age was adopted by the Florida Legislature with the purest of motives: a sincere concern for the safety of Florida's motoring public and the safety of the troopers themselves. It does, however, directly conflict with an act of Congress which recognizes the fact that chronological age alone is a poor indicator of ability to perform a job and that many older American workers perform at levels equal or superior to their younger colleagues. *Criswell*, 472 U.S. at 409, 105 S.Ct. at 2749. That Act, the ADEA, was adopted "to promote employment of older persons based on their ability rather than age [and] to prohibit arbitrary age discrimination in employment." 29 U.S.C. § 621(b). Despite its proper motivation, FHP violated the Age Discrimination in Employment Act by requiring its troopers to retire at age 62.

Accordingly, it is ORDERED:

1. The Florida Highway Patrol has failed to prove that its mandatory retirement age is a *bona fide* occupational qualification.

2. FHP's policy of mandatory retirement of all uniformed officers at the age of 62 is a violation of the ADEA.

3. The remedy and damages issues in this case have not yet been determined.

The parties are ordered to confer with each other in an attempt to resolve these issues. If a resolution is not possible, the parties should make plans to litigate these issues in a timely manner.

4. The Clerk of the Court is ordered to schedule a status conference in this case within thirty (30) days from the date of this order.