Vernon D. HAYSE, Plaintiff,

v.

**TENNESSEE DEPARTMENT OF CON-SERVATION and Elbert T. Gill, Jr., Commissioner of the Tennessee Department of Conservation, Defendants.**

Civ. No. 4–88–082.

United States District Court,
E.D. Tennessee,
Winchester Division.

Aug. 2, 1989.

Theresa Ball, U.S. Dept. of Labor, Office of the Sol., Nashville, Tenn., for plaintiff.

Al Cocke, Asst. Atty. Gen., Nashville, Tenn., for defendants.

## MEMORANDUM OPINION

JARVIS, District Judge.

Plaintiff Vernon D. Hayse ("Hayse") brings this action against defendants seeking reemployment, wages, and other benefits as a result of alleged violations of the Veteran's Reemployment Rights Act, 38 U.S.C. §§ 2021, *et seq.*, (the "Act"). This matter was tried without intervention of a jury on June 15 and 16, 1989. At the close of all of the evidence, the court took the matter under advisement and gave the parties additional time within which to file post-trial memoranda. After consideration of the pleadings, testimony and exhibits introduced at trial, the parties' briefs and the applicable law, the court makes the following findings of fact and conclusions of law. Rule 52(a), Federal Rules of Civil Procedure.

### I. *Findings of Fact*

A. Did Plaintiff "Make Application"?

Hayse, a resident of Tracy City, Grundy County, Tennessee, applied for employment with defendant Tennessee Department of Conservation (the "Department") on November 19, 1981 [*see* Defendants' Trial Exhibit # 1]. Prior to applying, however, Hayse met with his uncle, Carlton Parmley ("Parmley"), who was a trails crew supervisor with the Department. This meeting took place in Parmley's office at the South

Cumberland Recreational Center on Monteagle Mountain. Because Parmley did not have the authority to hire Hayse, Parmley took Hayse to Bob Richards ("Richards"), who was Parmley's immediate supervisor, and whose office was adjacent to Parmley's. Richards provided Hayse with an application form, which Hayse completed [*see id.*]. Richards then forwarded the completed form to the Department for approval. It is important to note that the application form included a special block on Page 1 entitled "VETERANS INFORMATION".[1]

Hayse began working for the Department as a Laborer I on December 4, 1981 [*see* Plaintiff's Trial Exhibit #28]. Hayse's supervisor was Parmley, who not only supervised Hayse but also two other men. According to Parmley, the position of Laborer I generally involves trimming brush, cutting trees, and undertaking repair and light construction work such as the building of trails and bridges in parks and other designated areas. During the time in which Parmley supervised Hayse, Parmley usually met his crew either at a designated point in Monteagle, Tennessee, or at his home in Tracy City, Tennessee. On other occasions, however, Parmley would pick up his crew at their homes in a state vehicle at the beginning of the work day.

Sometime in the spring of 1983, Hayse notified Parmley that he would be leaving the Department to join the Army. Parmley's understanding was that Hayse would be working through the end of May, 1983 before entering the service in June, 1983. However, Hayse thought that he had accumulated enough leave time so that he would be able to quit a couple of weeks early. As a result, Hayse's last day of work was May 17, 1983 [*see* Plaintiff's Trial Exhibit #28].[2] It is undisputed that Hayse gave no indication at that time of returning to his job at the Department after serving time with the Army.

During the time in which Hayse served with the Army, Hayse admitted that he was informed about his rights under the Act. He was also advised that certain institutions, such as the Veterans Administration, would be available to assist him in asserting his rights under the Act. Additionally, Hayse discussed some of his rights under the Act with his father, also an Army veteran, who likewise testified that he was aware that his son had certain rights to reemployment under the Act.

The first discussion between Hayse and Parmley regarding the possibility of Hayse returning to his former job with the Department occurred during May, 1985, approximately 11 months before his anticipated release. This discussion transpired in Colorado Springs, Colorado as a result of a social visit by Parmley. It is important to note that Hayse admitted that he may not have stated with absolute certainty that he would be seeking his former job with the Department; rather, he may have told Parmley that he was just thinking about it. At any rate, Hayse and Parmley both remembered subsequent telephone conversations in which Hayse made further inquiries as to the possibility of returning to his former job with the Department. During these conversations, Parmley told Hayse that he had "no job available."[3]

---

1. It is also interesting to note that the application form required Hayse to answer whether or not he had any relatives employed in State service. However, Hayse was able to truthfully answer "no" to that inquiry even though Parmley, his uncle, was employed by the State since the form defined "relative" as a "parent, foster parent, parent-in-law, child, spouse, brother, foster brother, sister, foster sister, grandparent, grandchild, son-in-law, brother-in-law, daughter-in-law, sister-in-law, or any other family member residing in the same household." [*See id.*].

2. The testimony and exhibits introduced at trial [*see* Defendants' Trial Exhibit #2] reflect that

Hayse had not accumulated any leave time. Hayse was not, therefore, entitled to two weeks leave time (or any amount of leave time) with pay. The court mentions this fact only because the parties spent much time discussing it, even though the court was of the opinion then (and still is) that any evidence on this issue is irrelevant.

3. It is undisputed that the Department had no position available for Hayse throughout the entire relevant time period. When Hayse left his position of Laborer I with the Department in May, 1983, his position was subsequently filled by James Rhea, who held the position from

Additionally during these discussions, Hayse advised Parmley that federal law required the Department to return him to his former job. Parmley, however, was not aware of the existence of any such law and therefore contacted the Personnel Division of the Department to inquire about any such law. Parmley could not remember either the name or position of the employee with whom he spoke at the Personnel Division, but he did remember that the employee likewise did not know about any such law.

As a result of Parmley's inquiry with the Personnel Division, Parmley sent a letter to Hayse who was still in the Army.[4] The gist of that letter was that Parmley still knew nothing regarding veterans' rights and that no job was available for Hayse. Parmley's letter did, however, advise Hayse that he could reapply with the Department. This latter statement in Parmley's letter was acknowledged by plaintiff's ex-wife, who testified that she had read the letter.

Hayse was discharged from the Army on April 17, 1986 [see Plaintiff's Trial Exhibit # 22]. A couple of days after Hayse's return to Tracy City, his mother held a "welcome home" party for him and his wife. Several family members attended, including Parmley. At that party, Hayse again asked Parmley about returning to his former job. Parmley, as before, informed him that he presently had no openings. The only other conversation with Parmley that plaintiff could recall occurred a few weeks later on plaintiff's birthday, i.e., June 25, 1986, in front of Harold's Record Shop in Tracy City. Plaintiff again inquired about obtaining his job with the Department and, once again, Parmley informed him that he had no positions available. Plaintiff also testified that he asked Parmley to submit an application on his behalf, but that Parmley advised him that it would do no good since he would be unable to hire him anyway.

In response, Parmley testified that it was not his duty to carry, receive, or submit applications for the State of Tennessee. His job description, as classified by the Department of Personnel, did not include this function as part of his duties. Parmley also testified that he was not carrying any state applications during any of his discussions with Hayse. Parmley did admit, however, that if he had a position available, he had, in the past, obtained applications from some other source and had given them to prospective applicants. Nevertheless, he also emphasized that he was not required to do this. Moreover, in the spring of 1986, during the time in which plaintiff was making these inquiries, Parmley neither had an office nor a secretary to assist in the keeping, filing or maintaining of applications for the State. George Fletcher ("Fletcher"), a former director for the Personnel Division of the Department, similarly testified that the job duties of a Conservation Worker III, the position held by Parmley, did not include submitting or receiving applications for the State. Fletcher also testified that the Department employs over 1,600 employees and that there exist numerous divisions, supervisors, and subordinates within the Department.

In further support of their position, defendants offered the testimony of John Christof ("Christof"), who has worked eight years as Park Manager for the South Cumberland Recreational Area. Christof testified that he kept and maintained application forms as part of his job duties, and that he accepted and received applications from people in the Tracy City area on a regular basis. Christof also stated that if Hayse had come to him seeking a job, he would have assisted Hayse in preparing an application and would have instructed him

---

June 1, 1983 through February 3, 1984. That position was next filled by Lebran Reeves, who held the position from March 1, 1984 through September 5, 1984. The position was then filled by Jerry Payne who held the position from October 1, 1984 to the present. [See Plaintiff's Trial Exhibit # 23].

**4.** This letter was never introduced into evidence because the original and any copies have been lost or misplaced.

on how to send in the application to the Tennessee Department of Personnel. In fact, Christof has on occasion actually filled out this application for individuals who were having difficulty doing so. Christof also testified that he would have done the same for Hayse if he had needed assistance. Finally, Christof testified that he has previously forwarded applications for individuals and would have done so for Hayse.

In considering Christof's testimony, it must be pointed out that Parmley had suggested that Hayse contact Christof about a job after he returned from the Army. It is undisputed that Hayse knew Christof and had been to his office on numerous occasions. It is also undisputed that Christof's office was located within three miles of Hayse' home in Tracy City; yet, Hayse never contacted Christof during the spring of 1986 when he was trying to obtain a job with the State.

It must also be emphasized that Hayse likewise made no efforts to call or locate Richards, who had assisted him when he initially applied in 1981 with the Department. In fact, it was Richards—not Parmley—who had initially provided Hayse with an application in 1981. Although Richards was no longer located on Monteagle Mountain since he had moved to Nashville, Richards was Parmley's supervisor during the time of Hayse's inquiries in the spring of 1986.

In support of their position that the Department would have returned Hayse to his former job had he filled out a written application and submitted it to the State of Tennessee, defendants offered the testimony of Merry Chase ("Chase"), the personnel manager for the Department. Chase testified that it was part of her duties to review all application forms that were submitted to the Department. She further testified that if she had received an application which indicated that the applicant was a returning veteran, a position would have been found for that individual.

Similarly, Dorothy Shell ("Shell"), the assistant commissioner to the Department of Personnel, testified that the State of Tennessee has rules and regulations governing returning veterans seeking reemployment with state agencies. More importantly, she testified that the right to become reemployed is guaranteed by these rules and regulations, even if the employee does not take military leave. However, the essential requirement for all persons seeking either initial employment or reemployment with the State is that they fill out a written application on forms prescribed by the Commissioner of Personnel. This requirement is set forth in Rule 1120-2-.04(1) of the Department [see Defendants' Trial Exhibit # 22]. Shell further testified that all necessary information would be set forth on a completed state application. She also testified that had Hayse completed an application, which would have indicated not only that he was a returning veteran but also that he was previously employed with the Department, he would have been entitled to reinstatement with the State of Tennessee.

## B. Did Plaintiff Waive His Rights Under the Act?

Although Hayse unsuccessfully attempted to find a job in the Monteagle area, he accepted a job as a construction worker with the Jasper Construction Company ("JCC") in Atlanta, Georgia within two weeks of his discharge from the Army. Hayse was employed at JCC from May, 1986 until February, 1987. Hayse admits that his earnings from JCC from June, 1986 through December, 1986 exceeded the amount of money he would have earned had he been employed with the Department on a regular basis during that time frame [see Plaintiff's Trial Exhibit # 22]. Hayse testified that he earned approximately $7,500.00 more from JCC than he would have made working for the Department. However, plaintiff also testified that he and his wife were extremely unhappy in the Atlanta area. Part of this difficulty was due to the fact that they had a young child and that they were away from their families. They had also experienced at least one break-in into their Atlanta apartment. As a result, Hayse's wife and child left Atlanta during January, 1987 and re-

turned to the Tracy City area. Subsequently, Hayse commuted to Tracy City on the weekends in an effort to persuade his wife to return with him to Atlanta. His endeavors were unsuccessful and plaintiff voluntarily quit his job at JCC in Atlanta in February, 1987 and returned to the Tracy City area in order to keep his family together.

### C. Did Defendants Offer Plaintiff A Job of "Like Seniority, Status and Pay"?

Hayse was again unable to find employment in the Monteagle Mountain—Tracy City—Winchester area. Soon thereafter, he went to the offices of the Tennessee Department of Employment Security in Tullahoma, Tennessee in March, 1987. He was then referred to the Veterans Administration representative who gave him the phone number of the U.S. Department of Labor, Office of Veterans Reemployment Rights, in Nashville, Tennessee. On March 17, 1987, Hayse contacted Beverly White Gatewood[5] of that office and requested assistance in obtaining reinstatement with the Department [see Plaintiff's Trial Exhibit # 1]. Gatewood's duties specifically included investigating cases and asserting rights on behalf of returning veterans. After Gatewood confirmed Hayse's veteran status [see Plaintiff's Trial Exhibits # 2–# 4], she advised the defendants by letter dated April 1, 1987 that Hayse was pursuing his claim for employment with the Department [see Plaintiff's Trial Exhibit # 4].

After some investigation, the general counsel for the Department, Penny Harrington ("Harrington"), inquired by letter dated July 28, 1987 whether Hayse would be willing to accept a position with the Department without further litigation and with no back pay [see Plaintiff's Trial Exhibit # 12]. This inquiry was based on the understanding that the earnings plaintiff received from his construction job in Atlanta would offset any back pay that he might be seeking [see id.].

Although the Department was still of the opinion that Hayse was not entitled to his old job under the Act, it nevertheless attempted to settle this matter by offering Hayse the position of Conservation Worker I at Cumberland Mountain State Park at a salary of $779.00 per month. This offer was confirmed in correspondence to White from Harrington dated August 18, 1987 [see Plaintiff's Trial Exhibit # 16]. This letter also confirmed the fact that there were no positions open in the geographic area near Hayse's home; therefore, this job offer was in a "more distant location" [see id.]. The undisputed testimony at trial is that the drive to this job location near Crossville, Tennessee is approximately 60 miles (or one hour) away from Tracy City. It must be also emphasized, however, that the job position which was being offered to Hayse was "better" and paid more than the one which he had previously quit, i.e., Conservation Worker I at a salary of $779.00 per month as opposed to Laborer I at a salary of of·$666.00 per month [see id.].

Hayse rejected this job offer, claiming that he did not have reliable transportation, that he could not afford to move, and that the offer was not a position of like status. In support of his claim that he did not have reliable transportation, Hayse testified that his automobile was in "pretty rough shape" to the extent he could not drive to and from the proposed job site on a daily basis. Hayse also testified that he could not finance either the necessary repair work to make the automobile roadworthy or the expense of a move to Crossville. However, Hayse admitted that the automobile he owned at this time was the same automobile that he had used for transportation at JCC in Atlanta and the same one he had driven back and forth to Tracy City from Atlanta on a regular basis. Hayse further admitted that he made no efforts to seek other alternatives to travel to the proposed job site, such as riding with a friend or taking the bus.

**5.** This witness will be referred to as "Gatewood"; however, some of her correspondence will be referred to by her maiden name "White".

Hayse also claims that the job offer was not one of "like seniority, status and pay" as required by the Act, primarily because of its distance from Tracy City. In rebuttal, defendants contend that the job offered plaintiff was not only equal but also was "better" than the one he previously held. This position was supported by the credible testimony of Chase, who testified that the position of Conservation Worker I was an upgrade from the position of Laborer I formerly held by Hayse before he entered the Army. Chase also testified that the new position entailed basically the same duties as his former position. Additionally, she testified that Hayse was making $620.00 per month when he left as a Laborer I and that the new characterization of his old position would pay $740.00 per month, as opposed to the $779.00 per month which he was being offered. On a related matter, Fletcher testified that the Department's offer to Hayse was not intended to exclude any other benefits to which plaintiff would have been entitled, such as longevity pay, sick and annual leave, etc. The only element of damages which defendants' offer did not include was for back pay. Since the Department's offer was not accepted by Hayse, White wrote Harrington on September 29, 1987 and advised her that if she did not hear from her within ten days, the matter would be turned over to the Justice Department for litigation [*see* Plaintiff's Trial Exhibit # 21]. The instant lawsuit was filed on September 1, 1988, almost a year later [*see* Doc. 1].

## II. *Conclusions of Law*

### A. Generally

The Veteran's Reemployment Rights Act (the "Act") is codified in 38 U.S.C. §§ 2021, *et seq*. This court has jurisdiction of the subject matter and of the parties pursuant to the Act. 38 U.S.C. § 2022. The Act guarantees reemployment for veterans following completion of their military service. *See Baron v. United States Steel Corporation*, 649 F.Supp. 537, 540 (N.D.Ind. 1986). In the case of a returning veteran who has previously been employed by the State, the Act requires that he be reinstat-

ed "to a position of like seniority, status and pay". 38 U.S.C. § 2021(a)(B)(i). However, the statutory rights to reemployment are contingent on the veteran meeting several criteria set forth in the statute. *See Baron*, 649 F.Supp. at 540. Although the statute is to be liberally construed for the benefit of those who have served their country, *Fishgold v. Sullivan Drydock & Repair Corporation*, 328 U.S. 275, 285, 66 S.Ct. 1105, 1111, 90 L.Ed. 1230 (1946); *Barrett v. Grand Truck Western R.R. Company*, 581 F.2d 132, 135 (7th Cir.1978), *cert. denied*, 440 U.S. 946, 99 S.Ct. 1423, 59 L.Ed.2d 634 (1979), plaintiff bears the burden of proving that he has satisfied the statutory requirements and is entitled to receive reemployment rights. *Trulson v. Trane Company*, 738 F.2d 770, 772–73 (7th Cir.1984).

### B. Did Plaintiff "Make Application"?

■ A critical requirement for entitlement to reemployment rights under the Act is that a veteran "make[ ] application for reemployment within ninety days" after relief from military service. 38 U.S.C. § 2021(a)(2). In the instant case, the parties vigorously contest whether or not Hayse met this requirement. Because the Act does not define what is meant by the term "makes application", this court concludes that a case-by-case determination which focuses on the intent and reasonable expectations of both the former employee and employer, in light of all the circumstances, best serves the goals of the Act. *Shadle v. Superwood Corporation*, 858 F.2d 437, 439 (8th Cir.1988) (citing *Baron*, 649 F.Supp. at 541). What constitutes adequate notice under the Act will vary from case to case, depending upon the size of the firm, the number of employees, the length of time the returning veteran has been away, and a myriad of other factors. *Id*. at 440.

In applying the above analytical approach to the instant case, the court will first consider the expectations of the Department. It is clear that the employer does not have a right to expect a written application in every situation. *Id*. at 439 (citation omitted). However, it is equally

clear that an application involves more than a mere inquiry. *Id.* (citing *Lacek v. Peoples Laundry Company*, 94 F.Supp. 399, 401 (M.D.Pa.1950)) (no entitlement to reinstatement or lost wages where petitioner merely visits the supervisor and inquires as to conditions in the plant). Moreover, "[c]ommon sense dictates that an employer cannot be required to give every inquiry, regardless of how slight, full consideration and attention." *Baron*, 649 F.Supp. at 541. Certainly, if Hayse had submitted a written application to the Department before accepting employment with JCC, then he would have made application within the meaning of the Act. However, Hayse never even requested an application form. *Cf. Shadle*, 858 F.2d 437 (plaintiff actually requested a formal written application form at guard shack but was not given one; nevertheless, court held plaintiff had not made "application for reemployment" within the meaning of the Act.). Since Hayse failed to make a written application, the law requires that he bear the burden of making reasonable efforts to see that someone in a decision-making position at the Department is informed of his intentions. *See id.* at 440.

In analyzing the facts of this case from the expectational standpoint of defendants, it must be emphasized that the Department employs over 1,600 employees. Within the Department, there are numerous divisions, supervisors and subordinates. Given this large number of employees and supervisors, is it reasonable for the Department to expect that the only notice which it will receive by a returning veteran is a verbal inquiry to a trails crew supervisor, who also is the returning veteran's uncle? Likewise, is it reasonable for the Department to expect that this verbal notice be directed to an employee who not only has no authority to hire the applicant, but who also is not even required by the Department to keep application forms? This court answers both questions in the negative. This conclusion is especially true when the veteran never advised his former employer at the time he left that he would be returning to his former position since that employer never had expectations that

the employee would return, in this case, three years later. The Department has a right to expect that notice be received by someone who is in fact in a decision-making position, *i.e.*, someone who is able to hire the returning veteran. This could have been accomplished either by Hayse verbally contacting an individual who had the authority to hire him or by Hayse contacting an employee whose job encompasses the furnishing and forwarding of application forms to those who have authority to hire him. Therefore, the court concludes that Hayse has not satisfied the goals of the Act, at least from the expectational standpoint of the Department, because Parmley was neither in a decision-making position nor was he required to furnish applications to Hayse or any other returning veteran.

The court must next turn to the expectations of Hayse. As stated before, the *only* efforts by Hayse to apply for his former position were verbal inquiries to his uncle. Moreover, Hayse knew that Parmley was completely unfamiliar with the Act, even after he had made an inquiry within the Department to specifically find out about the reemployment rights of veterans. On the other hand, both Hayse and his father admitted that they were familiar with the Act and understood precisely what rights plaintiff had regarding his former position with the Department. In other words, both Hayse and his father knew that the Department was required to place Hayse in a position of "like seniority, status and pay" if Hayse made a timely application. However, Hayse also knew that when he first applied for a job with the Department, he was required to fill out a written application. He also knew that his uncle was not the individual who provided an application to him to complete and that it was Parmley's supervisor, Richards, who provided the application. Although Richards no longer had his office in the Tracy City area, the court is not impressed with the fact that plaintiff made no efforts whatsoever to contact Richards to fill out an application to receive a job he was entitled to. Likewise, the court is not impressed with

the fact that Hayse made no efforts to contact Christof, especially after Parmley told him Christof might have a job available. If Hayse had sent anything to either Richards or Christof in writing which clearly identified who he was and that he wanted his job back, the court could easily conclude that Hayse had "ma[de] application." In fact, if Hayse had even telephoned Richards or Christof, the court would be hard pressed to conclude that Hayse had not "ma[de] application." However, these facts are not before the court. Rather, the only individual to whom any arguable application was directed was, at best, an oral one to Parmley. The court concludes, therefore, that Hayse has not carried his burden of satisfying the statutory requirement of "mak[ing] application" since he could not have expected someone in a decision-making position to be put on notice under these circumstances.

### C. Did Plaintiff Waive His Rights Under the Act?

■ Even if the court assumes, *arguendo*, that Hayse's inquiries to his uncle about his old job satisfy the statutory requirement of "mak[ing] application within 90 days", the court further concludes that Hayse waived his rights under the Act by accepting a more lucrative position with a construction firm in Atlanta within two weeks of the time he returned from the service. Where an employee fails to make a prompt demand for reinstatement, and accepts reemployment elsewhere after his discharge, his actions amount to acquiescence in the employer's conduct, and result in forfeiture of any incidental rights to demand relief under the Act. *Azzerone v. W.B. Coon Company*, 73 F.Supp. 869 (W.D.N.Y.1947). This conclusion is especially true in light of the fact that Hayse made no other efforts within 90 days from the date of his discharge to make written application to anyone with the State nor even oral inquiry of anyone other than his uncle about reemployment with the State. It was not until Hayse voluntarily quit his construction job in February of 1987 that he began to vigorously assert his rights under the Act. At that point, however, plaintiff had gone well beyond the 90–day limitation period of the Act.

### D. Did Defendants Offer Plaintiff A Job of "Like Seniority, Status and Pay"?

■ Similarly, again assuming, *arguendo*, that Hayse has both timely made application and has not waived his rights under the Act, the court further concludes that the Department offered Hayse a job of "like seniority, status and pay". It is undisputed that the position which Hayse was offered—Conservation Worker I—was an upgrade of his former position of Laborer I. It is also undisputed that the monthly salary of $779.00 was not only an appropriate salary for that position but was considerably more than Hayse had earned in his former position. The job offered encompassed the same duties and responsibilities as his previous position. The only reason Hayse did not accept the position offered is due to the fact that it was 60 miles away from his home.

However, Hayse failed to demonstrate that it was unreasonable for him to accept such a job. His only proof at trial as to why he could not accept that job was that he did not have adequate transportation to work. Yet, the very vehicle Hayse says would not be adequate transportation for this job was the same vehicle which he had driven to work in Atlanta. Moreover, this was the same vehicle which had provided him transportation from Atlanta to the Tracy City area every other weekend throughout an eight to nine month period. The court is also not impressed with the fact that plaintiff made *no* inquiries whatsoever regarding alternate ways to get to work in Crossville. He did not make any inquiries with his friends nor did he inquire about a bus.

In analyzing the facts of the instant case on this issue under the Act, the case of *Bova v. General Mills, Inc.*, 173 F.2d 138 (6th Cir.1949), is particularly instructive. In *Bova*, plaintiff had previously been employed as a salesman with headquarters in Youngstown, Ohio. After he was discharged from the armed services, he was

offered: (1) a position as a salesman with headquarters at either Youngstown, Ohio or New Castle, Pennsylvania, both of which would include additional duties; or (2) a position in Akron, Ohio in a territory comparable to that in which he served prior to his induction and with the identical rights, duties and privileges which he had enjoyed at that time. As in the instant case, plaintiff insisted that his employer had to restore him to his identical position in Youngstown, even if it meant displacing a person holding this job. The court concluded, however, that the employer had made a good faith offer that was equivalent to his previous position, and that the actions of the employer constituted compliance with the Act. *Id.* at 140. *See also, Schwetzler v. Midwest Dairy Products Corporation,* 174 F.2d 612 (7th Cir.1949) (returning veteran, who is offered sales route which afforded comparable opportunities as to seniority, status and pay, was not entitled to restoration to his former employment as route salesman with same route which he was working immediately prior to induction). This court is unable to draw any meaningful distinction between the facts of *Bova* and the facts of the case at hand. Therefore, the court concludes that the Department's offer of the position in question was one of "like seniority, status and pay" as required by the Act.

Order accordingly.

## ORDER

For the reasons set forth in the Memorandum Opinion this day passed to the Clerk for filing, it is hereby ORDERED that judgment be, and the same hereby is, ENTERED in favor of the defendants, whereby plaintiff takes nothing on his claims. Plaintiff shall not, however, be responsible for any fees or court costs borne by the defendants. 38 U.S.C. § 2022.