Paul A. COUTURE, Plaintiff,

v.

EVERGREEN INTERNATIONAL
AIRLINES, Defendant.

Civil Action No. 95–554 MMS.

United States District Court,
D. Delaware.

Dec. 16, 1996.

Bayard J. Snyder, of Snyder & Associates, P.A., Wilmington (Robert F. Morris and William J. Searfoorce, Jr., of Cutler, Clemm & Morris, P.C., Plymouth Meeting, PA, of counsel), for plaintiff.

Donald E. Reid, of Morris, Nichols, Arsht & Tunnell, Wilmington (Norman A. Quandt, and Marc J. Eposito, of Ford & Harrison, Atlanta, GA, of counsel), for defendant.

*OPINION*

MURRAY M. SCHWARTZ, Senior District Judge.

## I.  INTRODUCTION

Plaintiff, Paul A. Couture, brought this action against defendant Evergreen International Airlines, Inc. ("Evergreen"), alleging a violation of the Veterans' Reemployment Rights Act ("VRRA"), 38 U.S.C. §§ 2021–2027.[1]  While employed by Evergreen as a

---

**1.** In 1992, the Veterans' Reemployment Rights Act, 38 U.S.C. §§ 2021–2027, was renumbered

flight engineer, Couture, an Air Force reservist, was activated for military duty during the Persian Gulf War. Couture alleges that after satisfactorily completing his military obligation, Evergreen re-employed him but refused to keep him "employed in his prior position, for which he remained qualified, or a position of like seniority, status and pay for a period of one year from his discharge from the armed services." Complaint, Docket Item ("D.I.") 1 at ¶ 8. Couture contends his termination was without cause and was thus unlawful under the VRRA. D.I. 21 at 11.

Evergreen now moves for summary judgment, arguing that it did satisfy its duty under the VRRA by restoring plaintiff to a position comparable to the one he had before the war. Evergreen maintains, however, that plaintiff showed "extreme incompetence" when he failed the training program required prior to reinstatement as a flight engineer. In short, Evergreen asserts that it terminated plaintiff for cause, a justification allowed under the VRRA.

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 38 U.S.C. § 2022. After considering the evidentiary record, as well as the arguments both oral and written, the Court will grant summary judgment in Evergreen's favor for the following reasons.

## II. FACTUAL BACKGROUND

The Court views, as it must, the following facts in the light most favorable to plaintiff, who is the non-moving party. Couture was hired by Evergreen in September, 1989, as a flight engineer[2] on civilian DC–8 aircraft.

Complaint, D.I. 1 at ¶ 5, Answer, D.I. 5 at ¶ 5. Prior to his employment with defendant, plaintiff served as a flight engineer aboard military aircraft, including the C–97G, the C–141, the C–5A, and the C–5B. Affidavit of Paul A. Couture, D.I. 22 at ¶ 2. He also had experience as an instructor engineer, training flight engineers for the military on C–5 aircraft. *Id.* Before coming to Evergreen, however, plaintiff had never worked for a civilian airline and had no experience on DC–8s, B–747s, or any other commercial aircraft. Deposition of Paul A. Couture, D.I. 20 at 23, 49.

During Couture's first few months of employment at Evergreen, he underwent training for DC–8 aircraft as mandated by the Federal Aviation Administration ("FAA"). D.I. 22 at ¶ 3. This instruction included both classroom sessions and flight simulation training. *Id.* By December, 1989, Couture officially qualified as a DC–8 flight engineer. *Id.*

While at Evergreen, Couture continued his thirty-plus year affiliation with the United States Air Force by serving as a part-time reservist. D.I. 20 at 27. Couture's reserve commitment required his spending one weekend each month and an additional 15 days in the summer training with his Air Force unit. *Id.* at 39. Evergreen consistently accommodated plaintiff's needs as a reservist and arranged his flight schedule so that it did not interfere with his military duties. *Id.* at 41.

On August 24, 1990, just short of Couture's first anniversary at Evergreen, the Air Force activated him into service for the Persian Gulf War. D.I. 1 at ¶ 5; D.I. 5 at ¶ 5.

---

Chapter 43, §§ 4301–4307 by Pub.L. No. 102–568, tit. V, § 506(a), Oct. 29, 1992, 106 Stat. 4340, 4341. Former section 2021 remained unchanged in its new incarnation. The VRRA was subsequently amended by the Uniformed Services Employment and Reemployment Rights Act, effective Oct. 13, 1994, codified at 38 U.S.C. §§ 4301–4333. Pub.L. No. 103–353, § 8, Oct. 13, 1994, 108 Stat. 3150. The Veterans' Benefits Improvements Act of 1996, effective Oct. 9, 1996, made additional minor changes to some sections. Because the reemployment at issue occurred prior to the VRRA's amendment and renumbering, the Court will refer to the former numbering in its discussion.

**2.** In the aviation world, air carriers usually employ three crew members in the cockpit: a captain, a first officer, and a flight engineer. *Western Air Lines, Inc. v. Criswell*, 472 U.S. 400, 403, 105 S.Ct. 2743, 2746, 86 L.Ed.2d 321 (1985). As pilot, the captain controls the aircraft. *Id.* He or she is responsible for all phases of its operation; the first officer is the copilot and assists the captain. *Id.* "The flight engineer usually monitors a side-facing instrument panel ... [and] does not operate the flight controls unless the captain and the first officer become incapacitated." *Id.* (quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 114, 105 S.Ct. 613, 618, 83 L.Ed.2d 523 (1985)).

During the hostilities, plaintiff was based in Massachusetts but served as a flight engineer aboard C–5 military aircraft on numerous overseas missions. D.I. 20 at 62–63.

Couture kept in contact with Evergreen while on active duty. *Id.* at 64–66. At no time did he perceive anger or negative feelings on Evergreen's part towards him because of his time away from Evergreen. *Id.* at 66. Before his release from service, plaintiff notified Evergreen that he intended to return to its employ following his tour of duty, which ultimately ended around July, 1991. *Id.* at 66–67. Rather than being returned to his DC–8 flight engineer job, however, Couture asked that he instead be assigned as a flight engineer aboard B–747 aircraft. *Id.* Although placement into that position is classified as a lateral move, D.I. 18 at ¶ 3, a B–747 position nevertheless paid a higher salary, the primary motivation for Couture's request, D.I. 20 at 67. Couture resumed employment with Evergreen in July, 1991. *Id.* at 68.

Because the FAA requires training for any flight crewmember who wishes to serve in the same capacity on a different airplane, *see* 14 C.F.R. §§ 121.400(c)(2) (1991), 121.425(a) (1991), Evergreen placed Couture in a 747 training class upon his release from active Air Force duty. D.I. 20 at 68. Even if Couture had requested reinstatement into his DC–8 flight engineer position, Evergreen would have placed him into a re-training program on that airplane as well. *See* 14 C.F.R. § 121.433(c)(1) (1991) (no carrier "may use any person nor may any person serve as a . . . crewmember on an airplane unless, within the preceding 12 calendar months . . . he has satisfactorily completed recurrent ground and flight training for that airplane. . . ."). Couture was aware that upon re-employment with Evergreen, he would have to undergo training for either the 747 position or the DC–8 position. D.I. 20 at 69. According to plaintiff's affidavit, however, because he had been previously certified as a flight engineer on the DC–8, he would have only needed refresher training on that

aircraft, *i.e.*, a program less extensive than the initial training and testing on the 747 aircraft. D.I. 22 at ¶ 7; Transcript of Hearing, D.I. 25 at 28. Upon his release from Desert Storm, plaintiff knew that his request for placement onto the 747 would require completion of the program of orientation and training on the 747, an aircraft new to him, rather than just refresher training on the DC–8, an aircraft familiar to him. D.I. 20 at 68–69; D.I. 22 at ¶ 7.

On July 15, 1991, Couture began his 747 training at Evergreen. After completing a three week session of classroom instruction, he passed a written proficiency exam with a grade of 86%. D.I. 20 at 71–73. The second part of the program involved 40 hours of actual aircraft training with a small group of other trainees: four sessions of model cockpit training were to be followed with six periods of flight simulation exercises. *Id.* at 70–71, 77, 96; D.I. 25 at 23–24, 43. Couture's instructor during this process was Evergreen Flight Engineer Check Airman Tibor Serfozo, who was responsible for documenting Couture's progress and evaluating his competency.[3] D.I. 20 at 79.

In the model cockpit sessions, Couture and his fellow candidates were drilled in their knowledge of the 747's systems and operating procedures. *Id.* at 84. It soon became apparent that Couture was experiencing difficulty in mastering the required concepts. For example, on August 1, 1991, Check Airman Serfozo noted Couture as admitting to having a weak understanding in takeoff and landing procedures. *Id.* at 92–93; D.I. 18 at Exhibit ("Exh.") A. Serfozo also perceived that Couture was "unsure" of normal operating procedures, a supposition Couture verified at his deposition. D.I. 20 at 94; D.I. 18, Exh. A. Couture enlisted the assistance of another Evergreen check airman for some additional one-on-one training. D.I. 20 at 103–04. In the third cockpit training session, Serfozo documented Couture as "taking abnormally long time to complete pre-flight" and needing to refer to written checklists as opposed to performing the required tasks

---

**3.** A check airman is one who conducts proficiency checks on flight deck personnel, as mandated by the FAA, during simulated and actual flight operations. *Allied Pilots Ass'n,* 19 N.M.B. 113, 117 (1991).

from memory. D.I. 18, Exh. A. After participating in all the model cockpit sessions, Couture knew he was still weak in those areas emphasized during the cockpit training. D.I. 20 at 102.

Following the model cockpit sessions, Couture and his fellow trainees then tested their skills for actual flight conditions in the simulator. *Id.* at 106. Couture admits that his knowledge of 747 system operations was still deficient at that point. *Id.* After the second simulator session, Couture was documented as "unable to recognize and correct abnormal start problems.... After several attempts of same problem, no improvement in recognizing the abnormality occurred. Alternate flaps and gear operation required extraordinary time to complete even with other crew member assisting. Appears to be unsure of himself when abnormal or emergency procedures are performed." D.I. 18, Exh A.

After the third simulator session, Couture was documented as being unable to differentiate between a flame-out and engine seizure, a fact punctuated in Serfozo's comments with three exclamation marks. *Id.* Couture also apparently at times hindered and interfered with the aircraft pilot's performance. *Id.* For the fourth simulator session, instructor Serfozo recruited another Evergreen employee, Check Airman David Roberts, to observe Couture's lack of progress. D.I. 20 at 112–13.

After Couture's fourth simulator session, Serfozo and Roberts conferred with Couture to discuss his ongoing problems and need for more 747 systems review and training. D.I. 20 at 113. Couture suggested that Evergreen allow him to switch instructors, *id.*, because he felt that Serfozo should have spent more time explaining and reviewing procedures before and after each session, *id.* at 99, 105. Couture left the meeting with the impression that he would henceforth become a student under Check Airman Roberts. *Id.* at 113.

Roberts and Serfozo forwarded individual written assessments of Couture's performance to Evergreen's System Chief Pilot, Robert Warren. As System Chief Pilot, Warren was responsible for exercising final authority over training program personnel

decisions. D.I. 18 at ¶2. Warren reviewed Serfozo's remarks as outlined above, as well as the commentary from Roberts, including the following excerpt:

[M]y primary observations of Mr. Couture was that he was deficient in 747 systems knowlege [*sic*] to the point that he was unable to tie or obtain answers and discussion from panel pictures and logic diagrams that were available. He was basicly [*sic*] unable to answer operational or system knowlege [*sic*] questions and lacked the confidence to even venture· educated guesses without leading from the instructor or his sim partner (Mr. Dye).

\*    \*    \*    \*    \*    \*

Mr. Couture performed his normal procedures in a· slow but essentialy [*sic*] correct manner. Introduction of abnormal or emergency problems tended to cause breakdown in crew coordination, scan, and accomplishment of normal duties as he would become focused on each problem. This coupled with a less than stellar performance by the pilots and a general lack of situational awareness tended to , turn every problem into an overload situation....

D.I.· 18, Exh. B. Roberts concluded Couture "was unprepared to satisfactorily accomplish a proficiency check in the 747 simulator" and "was considerably lacking in knowlege [*sic*] of the 747 and its systems." *Id.* In Roberts' view, Couture's difficulties should have been identified earlier in his training, and he should have been instructed one-on-one. *Id.* Finally, Roberts opined that Couture should have been moved to a crew containing at least one pilot with strong ability because Couture's crew lacked cohesiveness and coordination as a whole. *Id.*

After reviewing these evaluations, System Chief Warren perceived Couture's problems as indicative of "extreme ... incompetence," D.I. 18 at ¶2, and decided to terminate Couture's employment with Evergreen, *id.* at ¶4. The actual task of informing Couture of his termination fell to Steve Harp, Evergreen's Chief 747 Flight Engineer. D.I. 18, Exh. B; D.I. 20 at 118. According to Couture, Harp telephoned and told him Evergreen was lay-

ing him off and there would be no additional training or switching of instructors. *Id.* at 118–19. Although Couture agreed that while he was not qualified to perform as his duties on the 747, he asserted he could master the required skills if Evergreen would provide additional training with another instructor. *Id.* In the alternative, Couture requested that he be reinstated back into his previous position as a DC–8 flight engineer, to which Harp replied, "No," without further explanation. *Id.* at 122.

According to Systems Chief Warren, a candidate who fails a transition program is eligible to return to his former position only if it is clear that the candidate can become competent and proficient with "minimal additional training." D.I. 18 at ¶ 9. In his sworn affidavit, Warren declared that "Couture was not returned to the DC–8 after his 747 training failure because of the extreme degree of his incompetence." *Id.* at ¶ 10. Warren concluded that "[b]ased on [Couture's] horrendous performance in 747 training, ... his skills were so deficient that he would not have done any better on the DC–8 and would not have been able to pass DC–8 recurrent training. Couture simply did not have the skills to safely or adequately perform as a flight engineer on any aircraft." *Id.* At the time of his termination, Couture had completed four out of the six required simulator sessions in his 747 training.[4]

### III. DISCUSSION

#### A. Standard for Summary Judgment

Summary judgment is appropriate only when it is demonstrated that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). A dispute over the facts which might affect the outcome of the case under the governing substantive law will preclude entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510,

91 L.Ed.2d 202 (1986); *Orsatti v. New Jersey State Police,* 71 F.3d 480, 482 (3d Cir.1995). In determining whether the dispute is genuine for purposes of Rule 56, the Court's duty is to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

When the allegations of the non-moving party contradict those asserted by the moving party, the assertions of the non-moving party must receive the benefit of the doubt, *Bixler v. Central Pa. Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1297–98 (3d Cir.1993), and the non-moving party must receive the benefit of all reasonable inferences. *Sempier v. Johnson & Higgins,* 45 F.3d 724, 727 (3d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995). If, however, the facts are undisputed, and the issues presented are legal, rather than factual, the case may well be suited for resolution by judgment as a matter of law. *Associated Hardware Supply Co. v. Big Wheel Distrib. Co.,* 355 F.2d 114, 119 (3d Cir.1966).

#### B. The Veterans' Reemployment Rights Act ("VRRA")

#### 1. Restoration of Couture's employment with Evergreen

Chapter 20 of Title 38 of the United States Code, "Veterans' Reemployment Rights," provides employment protection to those called to active military duty. *Nichols v. Department of Veterans Affairs,* 11 F.3d 160, 162 (Fed.Cir.1993). These reemployment rights have existed since the enactment of this country's first peacetime draft law, the Selective Training and Service Act of 1940. *Id.* The VRRA guarantees reemployment for veterans following completion of their military service. *Coffy v. Republic Steel Corp.,* 447 U.S. 191, 195, 100 S.Ct. 2100, 2104, 65 L.Ed.2d 53 (1980). If one leaves a job with a private employer to enter active military duty, the VRRA requires that the veteran be restored to his or her former "position

---

4. In their briefs, the parties disagreed over the actual number of simulator sessions Couture was allowed to complete before being terminated. *See* D.I. 21 at 4, D.I. 23 at 5. During the hearing

in this matter both parties stipulated that Couture had completed the 16 required hours of cockpit training and 16 of the required 24 hours of simulator training. D.I. 25 at 24, 43.

or to a position of like seniority, status, and pay." 38 U.S.C. § 2021(a)(B)(i).[5] Restoration to the former position or its equivalent is predicated upon the veteran's honorable discharge, timely application for reinstatement, and qualification to perform the duties of such position. *Id.* at § 2021(a)(A)(i), (a)(B)(i). Subsection (b)(3) explicitly provides that "Any person who seeks or holds a position described in clause (A) or (B) of subsection (a) of this section shall not be denied hiring, retention in employment, or any promotion or other incident or advantage of employment because of any obligation as a member of a Reserve component of the Armed Forces. *Id.* at § 2021(b)(3).

■ The VRRA does not require that a veteran seeking reemployment "be given the same position [held prior to military service], but only that he be given that position or a comparable one." *Schwetzler v. Midwest Dairy Prods. Corp.*, 174 F.2d 612, 613 (7th Cir.1949). Under the VRRA, the employer may place the returning soldier into a comparable position that carries like "responsibility, duties, and authority." *Nichols*, 11 F.3d 160, 164 (Fed.Cir.1993). This fulfills the "manifest purpose" of the Act, that is, ensuring that a veteran who is forced to be absent from civilian employment will not be penalized upon his or her return. *Fann v. Modlin*, 687 F.Supp. 218, 219 (E.D.N.C.1988). Although the VRRA is to be liberally construed on behalf of those who have served their country, *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 285, 66 S.Ct. 1105, 1111, 90 L.Ed. 1230 (1946), the plaintiff bears the burden of proving that he has satisfied the statutory requirements and is

entitled to receive the benefit of the right to reemployment. *Trulson v. Trane Co.*, 738 F.2d 770, 772–73 (7th Cir.1984); *Smith v. Missouri Pacific Transp. Co.*, 313 F.2d 676, 680 (8th Cir.1963) (Blackmun, J.).

The parties do not dispute that Couture sought restoration of employment with Evergreen under the VRRA. Couture has also made it abundantly clear that he is not charging Evergreen with discrimination against him because of his reserve status or military service. D.I. 21 at 8 n. 8; D.I. 25 at 7. Although the parties agree on the relevant facts leading up to plaintiff's reinstatement, they part company on the legal interpretation and conclusions to be drawn from those facts. In dispute are several issues which will be addressed seriatim.

■ First, the parties disagree on whether Evergreen fulfilled its duty of reinstatement to a "position of like seniority, status, and pay." Evergreen contends that before and after his military leave, plaintiff was employed as a flight engineer. Prior to his activation to Desert Storm, plaintiff was a flight engineer on Evergreen's DC–8 aircraft; upon reinstatement, Evergreen reemployed him as a flight engineer, albeit on a different aircraft, the 747. Stated differently, Evergreen contends that the only aspect of his employment that changed was the aircraft to which plaintiff was assigned. D.I. 17 at 12. Therefore, Evergreen argues, it restored Couture to a position of like status.

■ Plaintiff counters by arguing that he was not restored to employment in the capacity of a 747 flight engineer. He asserts that

5. 38 U.S.C. § 2021 provides in relevant part:
   (a) In the case of any person who is inducted into the Armed Forces of the United States ... and who leaves a position (other than a temporary position) in the employ of any employer in order to perform such training and service, and (1) receives a certificate described in section 9(a) of the Military Selective Service Act (relating to the satisfactory completion of military service), and (2) makes application for reemployment within ninety days after such person is relieved from such training and service ...—
   *   *   *   *   *   *
   (B) if such position was in the employ of a ... private employer, such person shall—

   (i) if still qualified to perform the duties of such position, be restored by such employer ... to such position or to a position of like seniority, status, and pay;
   *   *   *   *   *   *
   unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so. ...

he was merely reemployed as a 747 flight engineer *trainee,* a position purportedly not comparable to his previous position as a qualified DC–8 flight engineer. Couture maintains that he was never assigned as a flight engineer to a 747 aircraft and could not have been so assigned because he was fired before he was allowed to complete the FAA-mandated 747 training program. Couture concludes that because the only civilian aircraft for which he was qualified as a flight engineer was the DC–8, the only position of comparable status to which he could be returned was the same one he had occupied prior to Desert Storm. D.I. 21 at 10. This argument, however, fails for two reasons.

First, it was plaintiff himself who affirmatively requested that Evergreen reemploy him as a flight engineer on a 747. He was well aware that to achieve this goal, training and orientation to the 747 was a necessary prerequisite to qualification on that aircraft. D.I. 20 at 66, 69. If plaintiff now argues that he had a statutory right to reemployment as a DC–8 flight engineer, the question then becomes what is the effect of his requesting placement into what he claims to be a different position, *i.e.,* did he waive his asserted right to his former job?

Under the VRRA, it has been frequently held that a waiver by a veteran of his or her statutory reemployment rights must be clear and unequivocal. *See, e.g., Paisley v. City of Minneapolis,* 79 F.3d 722, 724 (8th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 298, 136 L.Ed.2d 217 (1996); *Ryan v. Rush–Presbyterian–St. Luke's Med. Ctr.,* 15 F.3d 697, 699 (7th Cir.1994). Although there is no precedent directly on point with the facts at bar, there is authority that is nevertheless instructive. Courts have not hesitated to find waiver in a variety of factual matrices; generally, where a veteran has elected to pursue or accept other employment in lieu of reinstatement, the veteran has been deemed to waive his reemployment rights under federal law. *See e.g., Paisley,* 79 F.3d at 724–25 (policeman who continually reenlisted for active duty with National Guard and resigned "reluctantly" from police force waived right to reemployment after leave from military); *Hayse v. Tennessee Dep't of Conservation,*

750 F.Supp. 298, 305 (E.D.Tenn.1989) (waiver found where veteran accepted a more lucrative position with other employer and failed to make a prompt demand for reinstatement with former employer), *aff'd,* 915 F.2d 1571 (6th Cir.1990); *Carmalt v. General Motors Acceptance Corp.,* 302 F.2d 589, 590 (3d Cir. 1962) (veteran who stated "all right" when denied reemployment and who subsequently secured other jobs deemed to have abandoned statutory right to reemployment); *Walsh v. Chicago Bridge & Iron Co.,* 90 F.Supp. 322, 325 (N.D.Ill.1949) (veteran who elected to be restored to a different position in a different corporate division of former employer deemed to waive right to reemployment to former position).

These cases demonstrate that where a veteran seeks reinstatement with a former employer, but affirmatively requests placement into a position where he knowingly has to fulfill more rigorous standards than those required by the position held prior to his activation or induction into military service, the veteran may be deemed to have waived his right to reinstatement into his old position. In the case *sub judice,* Couture contacted Evergreen on numerous occasions prior to the termination of his active duty, informing his civilian employer of his plan to come back to work. D.I. 20 at 64–65. It was Couture who broached the subject of being hired back in a different position, *i.e.,* that of a 747 flight engineer, a position that carried a higher salary than Couture's former position as a DC–8 flight engineer. *Id.* at 66. Couture admits that he was so motivated by the promise of a better salary. *Id.* There is no suggestion that Couture did not understand his legal rights under the Act, *see Paisley,* 79 F.3d at 724; his actions in requesting what he now argues to be a better position were clear and unequivocal. He admits that he knew he would have to qualify into that new position. The Court cannot help but conclude that Couture voluntarily sought such a position and that he cannot now be heard to complain that Evergreen did as he requested. Therefore, if the Court is to agree with plaintiff that Evergreen failed to restore him to a comparable position, the Court must also find that this re-

sulted from plaintiff's own waiver of his right to that position.

Even if the Court did not find that plaintiff waived his statutory right to reemployment, the Court would still find that Evergreen complied with its duty to restore Couture to the position of flight engineer. It is well settled that the VRRA does not require that the returning veteran be restored to the identical position, but only that he be given that position or a comparable one. *Boone v. Fort Worth & Denver Ry. Co.*, 223 F.2d 766, 770 (5th Cir.1955); *Major v. Phillips–Jones Corp.*, 192 F.2d 186, 188 (2d Cir.1951), *cert. denied*, 343 U.S. 927, 72 S.Ct. 760, 96 L.Ed. 1338 (1952); *Schwetzler*, 174 F.2d at 613; *Bova v. General Mills*, 173 F.2d 138, 139 (6th Cir.1949). Plaintiff argues that Evergreen did not hire him back as a 747 flight engineer; rather, they hired him as a 747 flight engineer *trainee*. Evergreen counters by arguing that it does not hire "trainees;" it confers flight engineer status and pay to its employees even though FAA-mandated certification may be pending. Second Affidavit of Robert Warren, D.I. 24 at ¶ 6.

As in his previous line of argument, plaintiff meets himself coming. If he is to be considered a trainee on the 747 by virtue of his enrollment in the training program, this "trainee" status would have likewise attached if he had been reemployed for the DC–8. Although Couture maintains that he was qualified as a flight engineer on DC–8 aircraft, this assertion somewhat overstates his eligibility to return to Evergreen as a DC–8 flight engineer. Because his annual proficiency period on the DC–8 had expired in 1990, and because almost a year had elapsed since he had last worked on a DC–8, Couture concedes that he would have been required to be recertified on the DC–8 before he would have been allowed to work as a flight engineer on that aircraft. D.I. 20 at 68–69. Thus, notwithstanding the type of aircraft on which plaintiff would have been assigned as flight engineer, he was required to undergo certification training and, following his logic, would have been a trainee for purposes of DC–8 certification. Stated differently, because Couture was not certified or qualified on the 747 or the DC–8 upon his reinstatement at Evergreen, his supposed trainee status would have been the same for either of these aircraft.

Under the VRRA, Evergreen needed to restore Couture to a position of like "responsibility, duties, and authority." *Nichols*, 11 F.3d at 164. There is no evidence in the record that the duties and responsibilities of a flight engineer on a 747 versus a DC–8 are not comparable or that the two positions should not be considered of like responsibilities, duties, and authority[6] under the VRRA. *See* D.I. 25 at 47–48. The only aspect of his employment that differed from his original DC–8 position was the aircraft to which he was assigned. Accordingly, considering all of the above facts, the Court concludes that Evergreen restored plaintiff to a "position of like seniority, status, and pay," thus meeting its statutory obligation under the VRRA.

### 2. Evergreen's termination of Couture

Couture next argues that even if Evergreen satisfied its duty to reemploy him in a position of like seniority, status, and pay, Evergreen violated another provision of the Act when it terminated him just a few weeks after his reinstatement. The VRRA provides that a reinstated veteran can be terminated only for cause during the one-year period following his reemployment. 38 U.S.C. § 2021(b)(1).[7]

---

6. The parties have not argued, and the Court takes no position on whether the increased salary for the 747 flight engineer's position would warrant a finding that the two positions were not comparable.

7. This section provides
(b)(1) Any person who is restored to or employed in a position in accordance with the provisions of ... this section shall be considered as having been on furlough or leave of absence during such person's period of training and service in the Armed Forces, shall be so restored or reemployed without loss of seniority, shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was inducted into such forces, and shall not be discharged from such position without cause within one year after such restoration or reemployment.

As evidence that he was not terminated for cause, plaintiff highlights that he was discharged a mere 26 days after he was rehired. He adds that he satisfactorily completed the first three weeks of classroom instruction and earned a score of 86% when tested in that phase of his training. He emphasizes that his time in the flight simulator was prematurely curtailed and that Evergreen did not allow him to complete that phase of training. Further, plaintiff correctly points out that his instructor observed that plaintiff performed his normal procedures in a "slow but essentially correct manner." D.I. 18 at A–9. The instructor, Dave Roberts, also indicated that some of Couture's difficulties may have stemmed from the "less than stellar performance by the pilots" training with Couture. *Id.*

Evergreen argues that the record clearly indicates that Couture was discharged for cause, a justification allowed under the VRRA. The parties agree that the test for cause to be applied by the Court is "whether or not the discharge by the employer was a reasonable one under the circumstances." *See Kemp v. John Chatillon & Sons, Inc.,* 169 F.2d 203, 207 (3d Cir.1948); D.I. 25 at 27, 38. The cause intended by the statute does not have to be legal cause. *Kemp,* 169 F.2d at 206. "It may be such cause as a fair minded person may act upon, and where such action is not arbitrarily taken with a purpose or as an excuse to avoid the statute, it is cause within the meaning thereof." *Id.* at 206–07 (citation omitted).

The record contains overwhelming evidence that Couture failed to perform at a level where he would qualify as a 747 flight engineer, a fact admitted by Couture himself. A senior Evergreen employee, Robert Warren, has submitted two affidavits outlining reasons for plaintiff's discharge. He asserts that Couture was discharged because of his 747 training program failure and "the extreme nature of his incompetence." D.I. 18 at ¶ 4.

Attached to Warren's first affidavit were two exhibits, each from Couture's 747 training program instructors. In the first exhibit, instructor Tibor Serfozo's contemporaneous record of plaintiff's progress in the program reflected that Couture claimed to have weak understanding in take-off, landing, and inflight procedures. Serfozo additionally commented that plaintiff often appeared unsure of *normal* operating procedures, that he took an abnormally long time to complete preflight procedures, and that he relied heavily on written flow lists.

In a second exhibit, instructor Roberts documented that Couture was "deficient in 747 systems knowledge to the point that he was unable to tie or obtain answers and discussion from panel pictures and logic diagrams that were available. He was basicly [*sic*] unable to answer operational or system knowlege [*sic*] questions and lacked the confidence to even venture educated guesses without leading from the instructor or his sim partner." Although Roberts described Couture as performing in an essentially correct manner, Couture's performance was sub-standard because he could function only at a slower pace than required, and only in the absence of any distractions or flight problems.

It is beyond cavil that the responsibilities of a flight engineer are of the magnitude of life and death; the safety and livelihood of passengers and fellow crewmembers depend on the flight engineer's ability to perform at a minimum level of competence. The record is clear and uncontroverted that Couture did not have this ability; to allow him to continue as a 747 flight engineer would have been reckless on Evergreen's part. Although Evergreen terminated Couture before he finished his training, he was just two sessions shy of program completion and it was obvious that the two final sessions would not have brought him up to speed on the 747. Considering these facts even in the light most favorable to the plaintiff, the Court is hard pressed to find that plaintiff's termination was not for cause. Couture concedes that when he was terminated, he was not qualified to perform the job of 747 flight engineer and than he would have needed additional re-training.

Undaunted,[8] however, plaintiff insists that Evergreen should have reinstated him at

---

8. Couture also argued that within Warren's affidavit and its attached exhibits, there lurks a

that point as a DC–8 flight engineer, his former position.[9] Plaintiff's final argument, too, must fail. The Court has already found that plaintiff either waived his right to reinstatement to his former position or that Evergreen fulfilled its obligation of restoring him to a comparable position. Thus, Evergreen's duty to allow plaintiff a new round of training on DC–8 procedures would be beyond its statutory duty. While the VRRA is to be liberally construed in favor of the returning veteran, it "should not be carried to the point where it does violence to the Act itself." *Parliman v. Delaware, Lackawana, and W.R.R.*, 163 F.2d 726, 731 (3d Cir.1947); *Bozar v. Central Pa. Quarry, Stripping and Constr. Co.* 73 F.Supp. 803, 809 (M.D.Pa. 1947). Having found that the record shows, as a matter of law, that Evergreen fulfilled its statutory duty of reinstatement, and that plaintiff was terminated for cause, no more was required of the employer and Couture has no legal cause of action under the VRRA. Accordingly, the Court will grant summary judgment in favor of Evergreen.

genuine issue of material fact. D.I. 25 at 40–47. He asserts that because Warren did not follow the recommendation that Couture be retrained, there is a issue of fact as to Warren's credibility. While the Court at summary judgment does not make credibility determinations, the Court does note the total lack of record evidence that Warren was under any obligation to follow this advice, given by a subordinate employee. The uncontroverted record shows that Couture was not competent to perform as a 747 flight engineer. At that point, after fulfilling its duty under the VRRA, and legally justified to terminate Couture for cause, Evergreen had no statutory obligation to provide remedial or supplemental training.

Couture has emphasized repeatedly he is not charging Evergreen with discrimination. Barring such discrimination, the air carrier had the right to exercise business judgment involving Couture's risk to himself and others on the 747 aircraft. *See Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir.1991) (employer has the right to make business judgments especially where the decision involves subjective factors essential to

certain positions). The Court is extremely reluctant to interject an "unwarranted invasion or intrusion" into matters involving highly skilled professions in which the Court has little or no expertise. *Ezold v. Wolf, Block, Schorr and Solis–Cohen*, 983 F.2d 509, 527 (3d Cir.1992), *cert. denied*, 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993).

9. Although Couture reiterated several times he is not alleging that he was treated differently and terminated because of his reserve or active military status, he also names several cases where Evergreen employees who had failed transition training to another aircraft were allowed to resume their former positions. However, without any record evidence of these individual's status as civilians or reservists, Couture cannot prove for purposes of summary judgment that there is an issue of fact whether he was treated differently than others by Evergreen because of his military obligation.